136 B.R. 964 (1992)
In re OFFICE PRODUCTS OF AMERICA, INC., Debtor.
Bankruptcy No. 91-51849-C.
United States Bankruptcy Court, W.D. Texas, San Antonio Division.
January 8, 1992.
*965 *966 *967 *968 R. Glen Ayers, Jr., Cox & Smith, Inc., San Antonio, Tex., for debtor.
Robert L. Barrows, Lelaurin & Adams, P.C., San Antonio, Tex., for trustee Randolph N. Osherow.
DECISION AND ORDER ON APPLICATION OF DEBTOR'S COUNSEL FOR COMPENSATION AND REIMBURSEMENT
LEIF M. CLARK, Bankruptcy Judge.
CAME ON for hearing the application of Cox & Smith, Inc., counsel for the debtor in this chapter 7 case, for compensation and reimbursement, together with the objection filed by the chapter 7 trustee. Upon consideration thereof, the court finds and concludes that the application should be allowed in part and disallowed in part, as more fully set out herein.

FACTS
Office Products of America was one of the new genre of wholesale style office products retailers which have become popular in recent years. It began to have difficulties capitalizing after an initial period of aggressive expansion. Beginning in early 1991, the company began to seriously explore selling all or some of its stores. It consulted one of its law firms, Cox & Smith, regarding strategies for dealing with its debt. Eventually, the company decided that reorganization under chapter 11 was not a viable alternative, and so filed a chapter 7 liquidation case. Cox & Smith obtained a $25,000 retainer from the debtor immediately prior to filing, to cover the costs of bankruptcy representation.
Cox & Smith has now submitted a fee application for $31,745.52 in fees and expenses incurred in representing Office Products of America, Inc. (OPA) from April 24, 1991, through September 20, 1991. From May 14, 1991, through June 28, 1991, Cox & Smith was debtor's counsel in OPA's voluntary chapter 7 case. The firm has played a fairly active role throughout the case.
The chapter 7 Trustee objects to the Cox & Smith fee application because (1) the application includes charges for substantial amounts of prepetition work and for work done after debtor switched counsel, (2) the application includes charges for work benefitting the debtor's management, not the estate, and (3) the application contains some ill-defined entries and duplicative services, in addition to some very high hourly charges.
After a hearing (at which the court raised additional issues with counsel), this matter was taken under advisement. Now before the court are the following issues:
1. May a firm be compensated from a chapter 7 estate for prepetition legal services beyond the mere preparation of the bankruptcy papers?
2. May the firm be compensated from the estate for postpetition services which, though beneficial, may not fit within the rubric of "actual, necessary" services to the estate?
3. May the firm be compensated for services which benefit only the debtor or the debtor's officers, directors and/or shareholders?
4. Is this fee application sufficiently detailed to demonstrate the firm's entitlement to compensation from the estate for services rendered?
5. Does the fee application include charges for duplicated services, for services for which compensation from the estate is not permitted, or for services at an unwarranted high rate?
*969 6. Did the firm have a perfected security interest in the $25,000 retainer it received from the debtor prior to filing?
These issues are discussed in more detail below.

ANALYSIS
1. May Cox & Smith be compensated from the Chapter 7 estate for prepetition legal services which exceed mere preparation for a Chapter 7 case? May the firm be compensated from the estate for postpetition services which were beneficial to the estate? May the firm be compensated from the chapter 7 estate for services benefitting only the debtor or the debtor's directors, officers, and/or shareholders?
The extent to which the chapter 7 estate is liable for legal services rendered the estate depends, in part, upon the capacity in which the law firm was hired. For example, if Cox & Smith had been employed by the trustee (debtor-in-possession), with court approval, the firm might have been entitled to compensation for the sorts of services enumerated in Section 327. 11 U.S.C. § 328(a). Here, however, Cox & Smith was employed by the debtor, not the trustee (debtor-in-possession). Although the debtor sought court approval to employ Cox & Smith, such approval was probably unnecessary because the hiring was outside the scope of Section 327 anyway. See 2 Collier on Bankruptcy ¶ 327.07 (15th ed. 1991); see also In re Roberts, 46 B.R. 815, 822 (Bankr.D.Utah 1985), modified, 75 B.R. 402 (1987); In re Coastal Equities, Inc., 39 B.R. 304, 310 (Bankr.S.D.Cal.1984).
While nothing in the Bankruptcy Code forbids a chapter 7 debtor from hiring his own attorney, paying that attorney with funds from the chapter 7 estate is another matter. 11 U.S.C. § 330(a). It has been said that, as a general matter, a debtor's counsel may be compensated from the estate "for analyzing the debtor's financial condition; rendering advice and assistance to the debtor in determining whether or not to file bankruptcy; the actual preparation and filing of the petition [and required schedules, and statements]; and representing the debtor at the Section 341 meeting of creditors." In re Olen, 15 B.R. 750, 752 (Bankr.E.D.Mich.1981); see also In re Leff, 88 B.R. 105, 109 (Bankr.N.D.Tex.1988); In re Riverview Fin. Servs., Inc., 67 B.R. 714, 715 (Bankr.E.D.Mich.1986); In re Rosen, 25 B.R. 81, 84 (Bankr.D.S.C.1982). While true so far as it goes, this oft-quoted statement obscures the slightly more complicated task posed when counsel seeks compensation for significant pre-petition and postpetition services out of a retainer held for that purpose. Section 330 permits payment as an expense of administration of "reasonable" compensation to the "debtor's attorney" for "actual, necessary services" and reimbursement of said attorney's "actual, necessary expenses." 11 U.S.C. §§ 330(a), 503(b)(1)(A); In re Plunkett, 60 B.R. 290, 294 (Bankr.S.D.N.Y.1986); In re Howerton, 23 B.R. 58, 59 (Bankr.N.D.Tex.1982). Meanwhile, Section 329 permits a court to cancel any agreement for payment for services rendered pre-petition in contemplation of or in connection with a bankruptcy case, to the extent the proposed compensation exceeds the reasonable value of those services. 11 U.S.C. § 329(a); Matter of Kroh Bros. Development Co., 120 B.R. 997, 1000 (W.D.Mo.1989); In re Leff, 88 B.R. 105, 108-09 (Bankr.N.D.Tex.1988);[1]In re Smith, 48 B.R. 375, 382 (Bankr.C.D.Ill. 1984); In re Swartout, 20 B.R. 102, 107 (Bankr.S.D.Ohio 1982); In re Olen, 15 B.R. 750, 754 (Bankr.E.D.Mich.1981).
*970 In this case, the firm currently holds a pre-petition retainer of $25,000, contemplated to be applied to all fees to be incurred by the firm in connection with its bankruptcy filing. Some of those fees were incurred pre-petition, while some were incurred post-petition. The problem this poses for the court is that the firm's services are subject to two different standards of review, depending on when they were incurred. Pre-petition services may be compensated to the extent that they are "reasonable" (§ 329), while post-petition services must meet the "actual, necessary" standard (§ 330). The distinction in terms is not without a difference, for courts have devised different tests for the application of these two statutes. We turn first to pre-petition services and the application of § 329(b).
A. Pre-petition services
Some of the charges for which recovery is sought are pre-petition charges, while some are post-petition. This significant watershed is especially relevant in this case, for the firm currently holds a retainer received shortly before the filing, which ostensibly "secures" fees incurred by the firm.
Section 329(a) requires that "[a]ny attorney representing a debtor in a case under [Title 11], or in connection with such a case, whether or not such attorney applies for compensation under [Title 11], . . . file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation." The legislative history of § 329 indicates that the purpose of this section is to protect against the "serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney which payments to a debtor's attorney create." In re Trinsey, 115 B.R. 828, 835 (Bankr.E.D.Pa.1990) (citing S.Rep. No. 989, 95th Cong., 2d Sess. 39 (1978), reprinted in U.S.Code Cong. & Admin.News 1978, 5787, 5825). Section 329(b)(1)(A) authorizes the court to cancel any such agreement or, to the extent excessive, order the return of any such payment to the estate, if the property transferred would have been property of the estate.
The general rule, in Texas and elsewhere, is that a retainer is held in trust, as property of the client, until applied to the bill of the attorney. This will mean that such retainers are, in the usual case, property of the bankruptcy estate. 11 U.S.C. § 541(a)(1); see In re Leff, 88 B.R. 105, 107 (Bankr.N.D.Tex.1988); In re Chapel Gate Apts. Ltd., 64 B.R. 569, 572 (Bankr. N.D.Tex.1986); see also In re Independent Sales Corp., 73 B.R. 772, 774-75 (Bankr. S.D.Iowa 1987); In re Kinderhaus, 58 B.R. 94, 97 (Bankr.D.Minn.1986); but see Stewart v. Law Offices of Dennis Olson, 93 B.R. 91, 94 (N.D.Tex.1988) (to the extent retainer stands for pre-petition services, it is not property of the estate, absent a disgorgement order under § 329(a)).
Section 329 is implemented by Bankruptcy Rule 2017(a), which states that "[o]n motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor, to an attorney for services rendered or to be rendered is excessive." Rule 2017(a), Fed.R.Bankr.P. (1991) (emphasis added). Taken together, § 329 and Rule 2017 permit the court to "inquire into, examine, and if appropriate, set aside any prepetition transfer from a debtor to debtor's counsel if such transfer was made in connection with or in contemplation of the filing of the petition. The [c]ourt also has the power to inquire into, examine, and if appropriate, cancel any agreement entered by debtor and debtor's counsel in contemplation of services to be rendered in connection with bankruptcy" Chapel Gate, 64 B.R. at 574.
Clearly, then, the court has the authority to review prepetition fees paid to *971 debtor's counsel, regardless of their source and regardless of the terms of any agreement pursuant to which such fees are paid. Chapel Gate, 64 B.R. at 572 (citing In re Furniture Corp., 34 B.R. 46 (Bankr. S.D.Fla.1983) for the same proposition). In fact, the source of the payments becomes relevant primarily for determining to whom the court may order a refund to be paid. Id. Thus, the court may order all or any part of the retainer to be returned to the estate, pursuant to § 329, regardless of the claim of the firm that the retainer stands as "security" for its unpaid fees. 11 U.S.C. § 329(a); In re Trinsey, 115 B.R. 828, 834 (Bankr.E.D.Pa.1990); In re Leff, 88 B.R. 105, 109 (Bankr.N.D.Tex.1988).
Section 329(b) permits disgorgement of any payment or proposed payment for prepetition services to the extent the services are found "to exceed the reasonable value of such services." 11 U.S.C. § 329(b). The test applied is slightly different than that imposed on post-petition services by debtor's counsel in § 330(a). Nonetheless, courts have often applied the § 330(a) test in § 329(a) cases, usually because a retainer is involved and because the debtor's attorney intends the retainer to stand for services to be rendered to the debtor after the case is filed, e.g., for the defense of discharge and dischargeability litigation. See, e.g., In re Leff, 88 B.R. 105, 107 (Bankr.N.D.Tex.1988);
There are problems with the Leff approach, however. One is that it imposes upon prepetition services the same standard of compensation imposed on professionals who are working for the estate, even though such services are clearly not rendered for the estate's benefit. The "look-back" period of one year makes such an approach hard to justify. Prior to bankruptcy, attorneys retained by a debtor are clearly retained to represent the interests of the debtor, not the estate and its beneficiaries, the creditors. Indeed, the standards of professional conduct of most states require an attorney to zealously represent the interests of his or her client. That will often mean that assisting the debtor in legitimate pre-bankruptcy planning, often inconsistent with the interests of creditors. If only services which are beneficial to the estate are permitted, attorneys who represent debtors in financial straits will find their duty to their client compromised by their ability to be paid.[2]
The language of the statute itself seems to anticipate this problem, couching the standard of review solely in terms of "reasonableness," the self-same standard that standards of professional conduct in most states impose on attorneys. Giving a straightforward read to the statutory language of § 329(b) avoids the above-described conflict. Courts may fairly presume that Congress knew how to use similar terms of art to yield similar results. Had Congress desired to impose the same standard of review on prepetition legal services as it imposes on professionals retained by the estate, it could simply have used the same "actual, necessary" language as is employed in § 330(a). It did not do that and courts are obligated to give effect to the words Congress did use when it drafted § 329(b). Therefore, applying a "benefit to the estate" standard to prepetition services is not appropriate. Instead, we ask simply whether the compensation exceeds the reasonable value of those services. Thus, notwithstanding the fact that the retainer here in question is property of the bankruptcy estate, the fees for which it stands as security are tested under a more *972 relaxed standard, i.e., reasonableness, than under the stricter approach applied in § 330(a).[3]
Applying that standard to the prepetition services rendered the debtor in this case results in the allowance of a substantial portion (though not all) of those fees. All of the work performed was (as counsel readily acknowledged) in connection with the impending bankruptcy filing. Even though much of the work is not the sort of thing for which counsel could be compensated post-petition (such as work on SEC filings and investigation of tax liability to the various states in which OPA stores were located), the services do not appear to represent any "overreaching" on the part of the firm. Some services were excessive, in terms of the time spent on them relative to the billing rate of the professional performing those services. Too, some services were inadequately documented. Also, some services appear to have been rendered for the benefit not of the corporate debtor but for the benefit of its officers and directors, and do not therefore yield reasonable value to the corporate debtor. In the context of § 329, if the debtor is charged for services which benefit only the debtor's principals, the charges for those services exceed the reasonable value of those services to the debtor, and should not be allowed.[4]
The court has ample authority to evaluate those services against the same "reasonableness" standard routinely applied to fees in bankruptcy cases (as well as in fee-shifting cases), and to make appropriate adjustments. In re Rheuban, 121 B.R. 368, 383 (Bankr.C.D.Cal.1990) rev'd on other grounds, 124 B.R. 301 (C.D.Cal.1991); In re Yermakov, 718 F.2d 1465, 1471 (9th Cir.1983). Those adjustments are reflected in the fees actually allowed, as detailed in the appendix to this opinion.
B. Post-petition services
The chapter 7 estate is not obligated to compensate debtor's counsel for any other services, unless counsel shows that the services were indeed actual, necessary services which benefitted the estate. Leff, 88 B.R. at 108-09; Plunkett, 60 B.R. at 294. The critical question becomes determining what services count as "necessary."
Most cases discussing the award of fees in bankruptcy tend to speak in terms of whether the services "benefitted" the estate. See, e.g., In re Leff, supra; In re Taylor, 66 B.R. 390, 395 (Bankr.W.D.Pa. 1986); In re Plunkett, supra; In re Rosen, 25 B.R. 81, 84 (D.S.C.1982). This approach tends, in the view of this court, to *973 divert attention away from the proper inquiry, which is whether the services in question were even necessary in the context of the representation. See Matter of Ryan, 82 B.R. 929, 931-32 (N.D.Ill.1987).[5] As a matter of logic, if services are not necessary, their benefit to the estate is irrelevant. If services are found to have been necessary, on the other hand, they should presumptively be beneficial, on the theory that the estate hardly needs professionals to be rendering services which yield no benefit to the estate.[6]
An excellent example of the subtle but important shift in emphasis that comes from focusing on necessity rather than benefit can be found in a recent case out of the Ninth Circuit, in which the court denied compensation to a trustee's counsel for services which, though they generated "benefits" to the estate (e.g., a substantial claim was eliminated, taxes were "reduced," and a partnership interest was challenged), were found to be unnecessary when a cost-benefit analysis was applied. In re Riverside-Linden Investment Co., 925 F.2d 320, 322 (9th Cir.1991); see also In re Mayes, 101 B.R. 494, (Bankr.W.D.Mich.1988) (spending $1,200 to collect asset worth $1,900 not allowed). By emphasizing "necessity," professionals are encouraged to do what is necessary to wrap up a case in an efficient fashion, and discouraged from trying to confer benefits that are not really necessary (and often not really wanted).[7] In so doing, those professionals are (hopefully) less tempted to engage in "churning." See In re Riverside-Linden Investment Co., 99 B.R. 439, 443 (9th Cir. BAP 1989) ("when a cost benefit analysis indicates that the only parties who will likely benefit from an investigation of a claim are the trustee and his professionals, investigation is unwarranted").
What services are necessary for a chapter 7 debtor's counsel to perform in the context of estate administration? Under the Bankruptcy Act of 1898, most courts only allowed compensation to a chapter 7 debtor's attorney for assisting the debtor in performing his legal duties, as opposed to exercising his legal privileges. 2 Collier on Bankruptcy ¶ 330.04 (15th ed. 1991). The same standard has been held to apply under the Code. In re Taylor, 66 B.R. 390, 395 (Bankr.W.D.Pa. 1986). Noted the Taylor court,
Bankruptcy Code section 521 and Bankruptcy Rule 4002 outline the duties of the debtor. Those duties include:
1) Filing of the debtor's Schedules of assets and liabilities, list of creditors, and statement of financial affairs;
2) Filing a statement of intention to claim exemptions or reaffirm debts;
3) Cooperate [sic] with the Trustee, by delivering all property of the estate and all of the debtor's records to the *974 Trustee, to enable him to administer the estate;
4) Attend [sic] and submit [sic] to an examination (First Meeting of Creditors);
5) Attend [sic] any hearings on objections to discharge or dischargeability; and
6) Attend [sic] the discharge hearing. Many courts have held that compensation from the estate is not allowable for services which are not directly beneficial to the estate, or are only for the benefit of the debtor.
Id. (citations omitted). If debtor's counsel is performing tasks above and beyond those associated with the debtor's duties in a chapter 7 case, the services are not "necessary" to the administration of the estate within the meaning of the statute and should therefore not be compensable.
In this case, that is hardly the end of analysis, for not all chapter 7 debtors are created equal. Some require more work than do others. Section 521(3) directs a debtor to cooperate with the trustee "as necessary to enable the trustee to perform the trustee's duties . . ." 11 U.S.C. § 521(3). In this case, the debtor's duties in this regard were of necessity considerably broader, due to the nature of the business and the location of its principal assets. The trustee knew from the beginning that he needed to operate the debtor's stores at least for a short period of time to realize the value of the assets. These operations demanded the assistance of the debtor, including working with the debtor's prepetition lender, because only the debtor was sufficiently familiar with both legal and operational problems associated with running office products warehouse-style retail outlets located in eastern states over 1500 miles from the situs of the trustee. With inventory to account for, sales tax to take care of, and employee benefits to attend to (including making arrangements for withholding not only for federal income taxes but also state income taxes), there were many special duties imposed on this debtor not normally required of the usual debtor in chapter 7. Any actual, necessary legal services rendered to the debtor relative to its performing these important duties are compensable.
The fees ultimately awarded by this standard, as it turns out, will, in this case, at least exceed the usual sort of fee one might expect to be paid to a chapter 7 debtor's attorney. The nature of the company represented justifies this cost, however. See In re Plunkett, 60 B.R. at 294. Firstly, the company was publicly held, necessitating the preparation of a shareholder list and making sure those persons were made aware of the filing. Secondly, the stores' operations generated a large number of creditors, making the preparation of accurate and complete schedules a considerably more daunting task than it might normally be in the usual case. Thirdly, there was active interest in selling the stores as operating entities, making the need for continuity and active communication that much more important. And finally, an operating chapter 7 takes on some of the trappings of an operating chapter 11, so that the debtor, though not in possession, still has to be actively involved in working with the lender. Thus, the cost of this particular chapter 7 filing exceeded by a substantial margin what this court would normally expect to permit debtor's counsel to recover, yet that cost, after considerable review, appears to be justified on the unique facts of this case.
What about fees generated for services which, though beyond the ken of the debtor's duties, are urged to have been "beneficial" to the estate? Insofar as those services were not "necessary," the question serves as its own answer. There is no other basis for recovery of these fees than that set out in § 330(a). Section 503(b)(4), for example, is not available as an alternative source for payment. 11 U.S.C. § 503(b)(4). That section permits a creditor's attorney or accountant to be paid out of the estate for services rendered to that creditor, to the extent those services fit the categories described in § 503(b)(3) (filing an involuntary petition, recovering property transferred or concealed by a debtor, helping to prosecute a criminal offense relating *975 the case, otherwise making "a substantial contribution" in a case under chapter 9 or 11). Section 503(b)(1)(A) is also unavailable, as only the routine expenses associated with the administration of an estate, again subject to the "actual, necessary" standard are allowed under this section. F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 108 (3rd Cir.1988). There is no room in § 503 for debtor's counsel to qualify for compensation. In re Kahler, 84 B.R. 721, 723 (Bankr.D.Colo.1988); see also In re Plunkett, 60 B.R. at 294 (debtor's counsel's services in helping the trustee to work through "charges and countercharges made by the various parties . . . were merely volunteered . . . ").
The foregoing analysis also demonstrates with certainty that Cox & Smith cannot be compensated by the estate for those post-petition services which benefitted only the debtor or the debtor's directors, officers, and/or shareholders. See In re Howerton, 23 B.R. at 59; see also In re Taylor, 66 B.R. at 395; In re Rosen, 25 B.R. at 86. "A chapter 7 debtor's counsel must look to the debtor's exempt property and post-petition earnings to be compensated for . . . services" which "benefit the debtor personally but that do not benefit the estate." Leff, 88 B.R. at 109.
Cox & Smith's post-petition services relating to researching and determining individual tax liability worked solely to protect the individual interests of the debtor's directors, officers, or shareholders. Outside of bankruptcy, such services might be compensable out of a corporation's assets. In bankruptcy, though, these services were unnecessary and of no particular benefit to the chapter 7 estate, and so are not compensable.
A somewhat more difficult question is raised by the debtor's decision to convert this case to one under chapter 11 shortly after the extraordinary results of the store sales were realized. It is certainly the debtor's absolute right to convert its chapter 7 case to chapter 11. 11 U.S.C. § 706(a). "The policy of the provision is that the debtor should always be given the opportunity to repay his debts." H.Rep. No. 595, 95th Cong., 1st Sess. 380 (1977), U.S.Code Cong. & Admin.News 1978, p. 6336. It stretches the notion of duty to convert this policy into a public duty for which the estate should be expected to pay, however.
The facts of this case demonstrate why this is so. The unsecured creditors of the estate did not benefit from the brief, ill-fated conversion of this case to chapter 11. The case was ultimately reconverted to chapter 7 at some considerable cost to those creditors. Under the debtor's proposed chapter 11 business plan, the managers of OPA sought to use the newly-realized unencumbered sale funds to recapitalize their recently defunct company and start up new operations. Although this plan certainly had benefits for the debtor and its directors, officers, and/or shareholders, it offered little more to the unsecured creditors than the downside risk. Under the proposed plan, they would only have received stock of questionable value, foregoing the unencumbered cash from the sale. Not a single creditor supported the chapter 11, nor did the trustee. Nor, ultimately, did this court, which concluded that the proposal was simply too illusory to foist onto unsecured creditors. Obviously, then, not all conversions are beneficial to the estate, nor do all conversions necessarily further the public policy behind § 706(a).
In any event, the conversion of a chapter 7 case to a case under chapter 11 does not qualify as one of the duties which a debtor can be said to be obligated to discharge. The debtor suffers no penalty for failing to exercise the option, no matter how feasible a reorganization might be. Cf. 11 U.S.C. § 707(b); In re Goodson, 130 B.R. 897, 903 (Bankr.N.D.Okla.1991) (ability to file and perform a chapter 13 plan may be grounds for dismissing a chapter 7 case for substantial abuse). The absolute right to convert a case to chapter 11, notwithstanding the public policy it evinces, is more properly characterized as a right or privilege available to the debtor. There is no basis for compensating debtor's counsel for assisting *976 a chapter 7 debtor in exercising a right or privilege, as opposed to discharging a duty.
2. Is the Cox & Smith fee application sufficiently detailed to demonstrate the firm's entitlement to compensation from the estate for services rendered? Does the fee application include charges for duplicated services, for services for which compensation from the estate is not permitted, or for services at an unwarranted high rate?
In a fee application case, the burden of proof falls upon the applicant. Continental Ill. Nat'l Bank & Trust Co. v. Charles N. Wooten, Ltd. (In re Evangeline Ref. Co.), 890 F.2d 1312, 1326 (5th Cir.1989) (citing Hensley v. Eckerhart, 461 U.S. 424, 433-34, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40, 50-51 (1983) for the same proposition). In evaluating whether the applicant has met its burden of proof, the court must engage in the two-step analysis imposed by Section 330(a)(1). In re Temple Retirement Community, Inc., 97 B.R. 333, 338 (Bankr.W.D.Tex.1989). First, the court must decide whether the services rendered were necessary and appropriate. Id. Second, the court evaluates whether the compensation sought is reasonable. Id.
In order for the court to apply this two-step analysis, however, the fee application must provide "sufficient detail for the court to determine what work was done, by whom it was done, how long it took to do, whether there has been any duplication of effort, and what results were achieved." Id. In fact, a primary objective of the fee application itself is to reveal sufficient information to enable the court to determine whether the services rendered were reasonable, actual, and necessary. In re Pettibone Corp., 74 B.R. 293, 301 (Bankr. N.D.Ill.1987) (citing In re Jensen-Farley Pictures, Inc., 47 B.R. 557, 582 (Bankr. D.Utah 1985) for the same proposition). Moreover, Bankruptcy Rule 2016 requires "a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." (emphasis added). The standards set out in the case law are designed to aid the court in measuring the reasonableness of the services, and so apply with equal force to both pre-petition and post-petition services.
In particular, "services should be reported to the nearest tenth of an hour, and must not be lumped together." Temple Retirement, 97 B.R. at 339. Each type of service should be listed separately, with its corresponding time allotment, so that the court can decide whether the time spent per task was reasonable. In re Wiedau's, Inc., 78 B.R. 904, 908 (Bankr.S.D.Ill.1987); Pettibone, 74 B.R. at 302. Services which have been lumped together should not be compensated. Wiedau's, 78 B.R. at 908; Pettibone, 74 B.R. at 302. If services are lumped together and include an item for which compensation is not permitted, the entire entry can be disallowed. In re Wabash Valley Power Ass'n, Inc., 69 B.R. 471, 479 (Bankr.S.D.Ind.1987); In re Four Star Terminals, Inc., 42 B.R. 419, 434 n. 11 (Bankr.D.Alaska 1984).
Lumping is only one example of how an entry can fail to meet the fee applicant's burden of proof. Vague or general descriptions pose problems too. To illustrate, entries for phone calls are not compensable unless the purpose of the conversation, the length of the conversation, and names of the persons involved in the conversation are set out. Wiedau's, 78 B.R. at 908; Pettibone, 74 B.R. at 301. An entry such as "Various calls with Mr. Klimback and office regarding OPA" fails to indicate the function, substance, necessity, or benefit of the call with sufficient particularity to permit the court to evaluate whether or not the service is compensable. See Temple Retirement, 97 B.R. at 339.
Similarly, entries indicating a conference  whether intraoffice or otherwise  must include sufficient information to permit the court to evaluate the necessity of the service provided, the reasonableness of the time spent on the service, and the reasonableness of the fee charged for the service  including the need for a conference. See Wiedau's, 78 B.R. at 908; Pettibone, 74 B.R. at 301. While intraoffice *977 conferences are not prohibited, they must be justified. Temple Retirement, 97 B.R. at 339. Entries for intraoffice conferences, without any indication of why the conference is necessary or how it benefits the estate, are not compensable. See Pettibone, 74 B.R. at 301. Even when an intraoffice conference is justified, only one attorney may charge for it unless the necessity for each attorney's participation is explained. Wiedau's, 78 B.R. at 908.
Because Section 330 only permits compensation for necessary services, "a debtor's estate should not bear the burden of a duplication of services, and such duplication should be avoided by counsel on their own initiative by exercise of good `billing judgment.'" Pettibone, 74 B.R. at 303. Wholly apart from the necessity issue, however, attorneys in general are expected not to bill their clients twice for the same service, as it is never reasonable for attorneys to be paid twice for the same item. The court will disallow charges for duplicated services. Id.
A. Does the Cox & Smith fee application include charges for duplicated services (i.e., services rendered by Gresham, Davis)?
Cox & Smith rendered some services after the case was converted to chapter 11 and Gresham, Davis became counsel for OPA, the debtor-in-possession. These services are primarily of two types and are largely compensable.
The first category of post-conversion services involves the necessary transfer of records, materials, and information from Cox & Smith to the new counsel  Gresham, Davis. The Texas Disciplinary Rules of Professional Conduct require a terminated lawyer to surrender papers and property to which the client is entitled (Rule 1.15(d)) and to avoid unreasonably increasing the costs or other burdens of the case or unreasonably delaying resolution of a matter (Rule 3.02). Inasmuch as Cox & Smith was required to cooperate in making OPA's change of representation as efficient as possible, compensating Cox & Smith for services rendered to that end seems equitable.
The second category of post-conversion services involves preparation of the fee application for work completed prior to the conversion. In the Fifth Circuit, and elsewhere, reasonable compensation for preparation of a fee application is permissible. In re Braswell Motor Freight Lines, Inc., 630 F.2d 348, 351 (5th Cir.1980); Rose Pass Mines, Inc. v. Howard, 615 F.2d 1088, 1093 (5th Cir.1980); accord In re Nucorp Energy, Inc., 764 F.2d 655, 658-59 (9th Cir.1985); In re Chicago Lutheran Hosp. Ass'n, 89 B.R. 719, 736 (Bankr.N.D.Ill. 1988); Pettibone, 74 B.R. at 304. In the instant case, however, there is some question regarding the sheer amount of time spent in preparing the fee application and the cost of the services rendered for that purpose.
B. Did the Cox & Smith fee application include charges for services which are not compensable?
The fee application included $506.00 in charges for deliveries made by R. Ayers, at the rate of $230.00 per hour. Some courts have held that professionals should not be compensated for overhead or clerical activities such as copying documents or delivering papers. See, e.g., In re Wabash Valley Power Ass'n, Inc., 69 B.R. 471, 478 (Bankr.S.D.Ind.1987); In re R & B. Institutional Sales, Inc., 65 B.R. 876, 884 (Bankr.W.D.Pa.1986). Other courts have held that "non-legal work performed by a lawyer which could have been performed by less costly non-legal employees should command a lesser rate." E.g., Wiedau's, 78 B.R. at 908-09; Pettibone, 74 B.R. at 303. Since delivery service is not a legal service, it is certainly not compensable at the same rate as legal services. Moreover, $230 per hour is hardly reasonable compensation for the delivery of documents. Inasmuch as Section 330 only permits reasonable compensation for necessary professional services, this court would be justified in totally denying the $506.00 claim for delivery services as non-compensable overhead charges. At the *978 very least, the rate of compensation should be reduced to a rate appropriate for delivery services, rather than for top-of-the-line legal services. This is the approach taken here.
C. Does the Cox & Smith fee application include services for which excessively high rates were charged?
As the previous example shows, some of the services on the Cox & Smith fee application are rather high priced. However, once the problematic entries are removed, the overall fees charged generally seem more reasonable. This confirms the truism that a high hourly rate coupled with efficiently rendered services can be less expensive overall than a low hourly rate coupled with indiscriminately rendered services. The hourly rates charged will not be disturbed in this application, though the total charged for a given service has been in some cases adjusted to reflect an appropriate reasonable value for the services rendered.
3. Does Cox & Smith have a perfected, secured claim for attorneys' fees and expenses as a result of the $25,000 prepetition retainer it received from OPA?
Cox & Smith maintains that it has a security interest, in the amount of $25,000, for attorneys' fees and expenses, and that their security interest is perfected by possession. The firm then argues that any fees disallowed by this court will still be recoverable out of the "collateral," which secures those fees. There is some merit to this argument. In re Chapel Gate Apts. Ltd., 64 B.R. 569, 572 (Bankr. N.D.Tex.1986); see In re Yermakov, 718 F.2d 1465, 1472 (9th Cir.1983) (observing that fees not allowed as administrative expenses may still be allowed as general claims against the estate if earned prepetition). To the extent that the retainer secures services reviewable under § 329(a), the court is permitted to set aside the retainer, regardless of its standing as "security" for those services. 11 U.S.C. § 329(b). To the extent it secures post-petition services, it is available only to the extent those services are allowed by the estate, as the balance represents property of the estate. In re Leff, 88 B.R. at 109; see also 11 U.S.C. §§ 506(a), (d) (collateral available to the extent of the allowed claim of the creditor claiming an interest in the collateral; lien is otherwise void).
Assuming Cox & Smith is a secured creditor by virtue of this retainer, the collateral will secure whatever is owed to the firm. However, it is up to this court to determine what is owed to the firm (at least with regard to services relating to the bankruptcy filing). This determination of course extends to services rendered post-petition, by virtue of § 330. It also reaches pre-petition services as well. 11 U.S.C. § 329(a).

CONCLUSION
The attached Appendix provides a summary of the fees which are allowable consistent with this decision. The total fees allowed is $17,753.00. The total expenses allowed to the firm is $767.77. The balance of the funds held by the firm as a retainer are to returned to the trustee, pursuant to 11 U.S.C. § 329(b).
So ORDERED.

APPENDIX

DATE ATTY TIME AMNT DESCRIPTION
4/24/91 dm 1.30 162.50 telephone conferences with Mr. Noll, Ms. Carlyle,
 Mr. Kimble, and Mr. Ayers regarding involuntary
 bankruptcy
4/30 rga .30 69.00 telephone conf with Mr. Klimback regarding
 creditors
4/30 rga .50 115.00 telephone conf with Mr. Grafton regarding subordination
 agreement
*979
4/30 rga 1.00 230.00 meet with Mr. Denny and Mr. Klimback
5/01 cs[*] 1.80 117.00 office conf with Mr. Ayers and preparation of
 chapter 7 checklist; assemble sample forms
5/01 rga .50 115.00 review OPA status with creditors
5/01 rga .20 46.00 telephone conf with Mr. Klimback regarding
 security agreement
5/01 rga .80 184.00 prepare OPA filing package for Mr. Klimback
 and forward
5/01 rga 2.00 460.00 conferences with Debtor's employees regarding
 filing
5/01 rga 4.00 920.00 prepare for bankruptcymeetings, stock
 schedules, etc.
5/06 lg .50 62.50 office conf with Mr. Huffstickler regarding
 state sales tax and property taxes
5/06 ph 1.80 234.00 research requirement of listing equity holders;
 telephone conf with Mr. Ayers and office conf
 with Mr. Garsson regarding responsible person
 liability for taxes; telephone conf with Ms.
 Kurtz, UST, regarding filing
5/07 cs[*] .20 13.00 telephone conf with Mr. Ayers regarding information
 on preparation of mailing matrix for
 client
5/07 rga 2.50 400.00° telephone conf with Mr. Klimback and office
 conf with Ms. Silen regarding preparations for
 filing; telephone conf with UST
5/07 jm 1.00 125.00 telephone conf with Mr. Klimback; conf with
 Mr. Stephens; review lease agreements
5/07 rga 2.50 400.00° telephone conf with Mr. Klimback and off conf
 with Ms. Silen regarding preparations for filing;
 telephone conf with U.S. Trustee
5/07 rga 1.50 345.00 attend meeting of Board with Mr. Webster, et
 al.
5/08 rga 3.00 345.00° telephone conferences with Ms. Kurtz regarding
 filing; various telephone conf's with creditors
5/08 lg 1.00 125.00 research Rhode Island, New Jersey, Maryland
 and Texas law on personal property tax and
 sales tax as imposed on corporations
5/08 cs[*] .20 13.00 office conf with Mr. Ayers regarding Chapter 7
 petition
5/08 jm 2.00 250.00 review lease agreement; prepare memorandum;
 conf with Mr. Ayers; conf with Messrs.
 Ayers, Webster, Denny, Klimback and Morton;
 review multiple legal documents; telephone
 conf with Mr. Klimback
5/09 rga 3.00 690.00 conf with creditors and trustee regarding sales;
 meeting with Mr. Osherow regarding documents
5/09 js .25 51.25 conf with Mr. Webster and telephone conf with
 Ms. Jacobs regarding SEC filing requirements
5/09 jm 1.00 125.00 telephone conf with Mr. Klimback; conf with
 Mr. Ayers; review legal documents with respect
 to insurance rebate
5/10 rga 2.00 345.00° telephone conf with Messrs. Osherow [trustee],
 Klimback [officer] and Zable [counsel for lender]
 regarding proposed sale and interim orders
5/10 rga .80 20.00° deliver documents to Mr. Osherow
5/11 cs[*] 3.50 227.50 draft debtor's initial chapter 7 filings; office
 conferences with Mr. Ayers and out-of-office
 conf with client regarding initial filings
*980
5/13 dgw 6.50 1000.00[°] review file; prepare Form 8-K; telephone conf
 with ann wallace of SEC; telephone conf with
 T. Klimback; telephone conf with L. Bishop
 concerning Form 10-Q; prepare letter to SEC;
 telephone conf with Meredith Cross of SEC;
 prepare press release, etc.; telephone conf with
 Paul Perry and John Nelson; telephone conf
 with L. Bishop; office conf with Norman Miller;
 office conf with G. Ayers and T. Klimback;
 revise documents, etc.
5/13 cs[*] .40 26.00 telephone conf with clerk and Mr. Klimback
 regarding requirements for list of creditors and
 other pre-filing matters
5/13 cs[*] 4.60 299.00 complete and assemble initial filings and office
 conferences with Messrs. Ayers and Klimback
 regarding bankruptcy filings and related issues
5/13 cs[*] 1.00 65.00 Out-of-office conf at OPA for execution of
 chapter 7 filings
5/13 cs[*] .70 45.50 telephone conf's with trustee, counsel for unsecured
 creditors committee, and others, regarding
 filing
5/13 jm 1.50 100.00 telephone conf with Mr. Klimback; review legal
 documents; telephone conf with representative
 of Staples
5/13 rga 5.00 690.00[°] prepare OPA for chapter 7 filing including
 meetings with Mr. Klimback and Mr. Webster,
 and telephone conf's with creditors; meet with
 trustee
5/14 ds 6.00 540.00 review all litigation files to determine schedule
 of impending deadlines; telephone conf with
 Steve Northrup regarding bankruptcy of OPA
5/14 nm 4.00 600.00[°] SEC and NASD filings; press releases; telephone
 conf with G. Ayers
5/14 rga 4.00 920.00[°] meet with Mr. Klimback and counsel for Fremont
 Capital regarding filing
5/14 [bankruptcy filing]
5/15 rga 2.10 230.00[°] telephone conf with Messrs. Zable, Osherow
 and others regarding sale of OPA stores in
 Maryland
5/15 rga .50 115.00 calls from OPA employees regarding proofs of
 claim
5/15 rga .30 69.00 telephone inquiries from creditors regarding
 OPA filing
5/15 rga .90 115.00[°] take draft of offer to trustee's office
5/15 cs .80 52.00 office conf with Messrs. Ayers, Huffstickler,
 Stephens, and Ms. Simmons, regarding pending
 litigation and information needed for schedules
5/16 rga .10 23.00 telephone conf with Mr. Klimback regarding
 sale to Office Depot
5/16 rga .20 46.00 telephone conf with trustee regarding operations
5/16 rga .10 23.00 telephone conf with employee regarding filing
 of claim and operations
5/16 rga .50 115.00 telephone conf with trustee and Mr. Goldstein
 regarding sale to Office Depot
5/16 rga .50 60.00[°] deliver purchase offer to Mr. Osherow and
 review pleadings
5/16 ph .50 65.00 telephone conf with Mr. Finstein regarding purchases
 of assets
5/17 rga .30 69.00 telephone conf with Mr. Klimback regarding
 operations
*981
5/20 rga .50 115.00 telephone conf with Messrs. Klimback and Zable
 regarding cash collateral
5/20 rga .50 115.00 confer with trustee regarding cash collateral
5/20 rga .20 46.00 telephone call from Orin Systems regarding
 post-petition status
5/20 rga .20 46.00 telephone conf with Mr. Klimback regarding
 problems with cash collateral
5/20 rga .20 46.00 review status with Mr. Gregory, counsel for
 Cairo
5/21 jm .25 31.25 review correspondence from Vornado with respect
 to lease defaults
5/21 rga .50 115.00 telephone conf with Messrs. Zable and Osherow
5/21 cs[*] .50 32.50 office conf with Messrs. Ayers and Stephens
 regarding Pretrial Order received for Virginia
 Litigation; correspondence to Chapter 7 trustee
 regarding same
5/23 cs[*] .30 19.50 telephone conf with Mr. Carneiro and office
 conf with Mr. Ayers regarding need for extension
 of time for filing schedules
5/23 cs[*] .20 13.00 computer docket check regarding § 341 hrng
5/23 cs[*] 1.10 71.50 draft ex parte motion and order for extension
 of time
5/24 rga .30 69.00 finalize and file motion to extend time for
 schedules
5/28 rga .30 69.00 respond to buyer inquiry
5/29 rga .20 46.00 return call to Mr. Finstein regarding purchase
6/04 rga 2.00 460.00 assist parties and trustee in sale of stores and
 leases in Maryland; telephone calls to debtor,
 trustee and counsel for insurance co.
6/04 cs[*] .50 32.50 telephone conf with Mr. Carneiro and office
 conferences with Mr. Ayers regarding computation
 of employee benefits for schedules
6/05 rga 9.50 460.00[°] court hearing on sale of assets
6/05 rga .30 69.00 dictate 20 largest creditor filing
6/05 rga .50 69.00 telephone conf with Denny and Klimback regarding
 Paramus store
6/06 cs[*] 1.80 117.00 office conf with Mr. Ayers and telephone conf
 with Mr. Carneiro regarding list of shareholders
 and valuation of assets; office conf with
 Mr. Stephens regarding list of pending lawsuits
 for schedules; office conf with Mr. Ayers and
 telephone conf with Mr. Klimback regarding 20
 largest unsecured creditors and draft of list of
 same; preparation of list for filing and service
6/10 cs[*] 1.20 78.00 telephone conf with Mr. Carneiro regarding
 information on schedules; office conf with Mr.
 Ayers regarding list of shareholders
6/11 rga .30 69.00 telephone conf with transfer agent regarding
 status
6/11 rga .20 46.00 telephone conf with creditor regarding status
 (Century Paper)
6/11 cs[*] .60 39.00 telephone conf with Mr. Carneiro regarding list
 of shareholders and other matters relating to
 schedules
6/12 rga .30 69.00 call to Mr. Klimback regarding continuing leases
 and letter to Mr. Osherow
6/12 rga .30 69.00 return call to Mr. Loeffler (purchaser's attorney)
 regarding procedure
*982
6/12 rga 1.50 230.00[°] meet with debtors for review of schedules,
 preparation for § 341 meeting, discussion of
 sale, etc.
6/12 cs[*] 1.80 117.00 telephone conf with Mr. Carneiro and office
 conf with Messrs. Ayers and Klimback regarding
 schedules and statements; revise drafts of
 same and draft inserts
6/13 cs[*] 8.70 565.50 telephone conf with Mr. Carneiro and office
 conf with Mr. Macon and Mr. Huffstickler regarding
 information for schedules; out-of-office
 confe with Messrs. Klimback and Carneiro
 to finish schedules and statements
6/14 cs[*] 3.60 234.00 telephone conf with Mr. Carneiro and Hartford
 Ins. Co. and office conf with Mr. Ayers regarding
 information on schedules; office conf with
 Mr. Stephens regarding claims in lawsuits and
 review of various petitions for same; preparation
 of Summary of Assets and Liabilities; final
 preparation of Schedules and Statements
 for filing
6/17 cs[*] .40 26.00 telephone conf with and correspondence to Mr.
 Carneiro regarding Schedules and Statement of
 Affairs
6/20 rga 4.30 989.00 attend creditors meeting; prepare witnesses;
 meet with creditors afterwards
6/21 cs[*] .30 19.50 correspondence to Mr. Osherow regarding Virginia
 litigation
6/24 rga .60 115.00[°] telephone conf with Mr. Tate regarding landlord
 issues on Towson store; conf with trustee's
 office
6/28 cs[*] 1.10 71.50 office conf with Mr. Ayers and Mr. Gregory
 regarding creditor's list; preparation of original
 matrix and additions/corrections for delivery
 to Mr. Gregory
7/13 rga .50 115.00 turn over materials to Mr. Gregory and review
 with him
7/18 cs[*] 3.70 240.50 review all outstanding statements and segregate
 same for fee application; office conf with
 Mr. Ayers regarding same
8/26 cs[*] .80 52.00 office conf with Mr. Ayers regarding fee application
 and refer exhibits to accounting for revisions
 in compliance with local rules
9/12 cs[*] 1.10 71.50 begin drafting of fee application
9/13 cs[*] 3.90 125.00 continue draft of fee application and related
 documents (cover sheet, order, notice & summary)
9/16 cs[*] 3.40 221.00 complete draft of fee application and related
 documents; compute time and fees for various
 summaries required by local rules
9/17 rga .60 138.00 review fee application and conf with Ms. Silen
 re same; execute fee application
 ===== =========
TOTAL 17,753.00

NOTES
[1] The Leff court applied a "benefit to the estate" approach to a retainer otherwise analyzed under § 329, essentially glossing over the difference in terminology between § 329 and § 330. The court apparently took this route by fixing first on the its conclusion that the retainer in question was still property of the estate. It then concluded that property of the estate could not be paid to an attorney for services which did not benefit the estate, despite the fact that § 329 says nothing more than that the fees not exceed "the reasonable value of . . . such services." The statute does not indicate whether the value is to be measured in terms of value to the estate or value to the debtor. The difference (especially for an individual chapter 7 debtor facing dischargeability litigation) is significant.
[2] The court acknowledges that the legislative history to § 329 indicates that the provision is intended to guard not only against overreaching to the detriment of the debtor but also to safeguard the interests of creditors. In re Trinsey, 115 B.R. 828, 835 (Bankr.E.D.Pa.1990) (citing S.Rep. No. 989, 95th Cong., 2d Sess. 39 (1978), reprinted in U.S.Code Cong. & Admin.News 1978, 5787, 5825). Clearly, there are situations in which the activities of debtor's counsel so egregiously violate creditor interests that disgorgement would be well-founded under the authority of this section. Nevertheless, that is a different question entirely from whether the efforts of debtor's counsel benefitted the estate.
[3] This conclusion does not open the "loophole" discussed by the court in Leff. In re Leff, supra; see Matter of Ryan, supra at 932-33. Debtors facing discharge or dischargeability problems may be tempted to pay their lawyers a significant sum in anticipation of post-bankruptcy litigation, and their lawyers will argue that, so long as the sum paid is reasonable relative to the litigation services, the money should not be vulnerable to a turnover under § 329(b). See, e.g., Stewart v. Law Offices of Dennis Olson, 93 B.R. 91, 92-93 (N.D.Tex.1988). In essence, creditors are forced under this scenario to finance the debtor's defense of an action initiated for the benefit of those same creditors. As the Ryan court observed,

Allowing attorneys to collect fees from the bankruptcy estate for their defense of debtors against creditors' dischargeability complaints . . . would [enhance the debtors' opportunity for a `fresh start'] . . . at the cost of leaving less  perhaps far less  of the bankruptcy estate to be distributed among creditors. . . . We will not allow fees on these facts in the absence of any reason to believe that Congress intended to allow payment from the estate for services which only benefit the debtor personally.
Ryan, 82 B.R. at 933. Indeed, the loophole is not available, for, to the extent the retainer in question serves for services yet to be rendered, it is clearly property of the estate, rendering it subject to the traditional inquiry regarding post-petition services to be rendered by debtor's counsel. See Stewart v. Law Offices of Dennis Olson, supra at 95; Matter of Jones, 665 F.2d 60 (5th Cir.1982) (Act case); In re Lilliston, 127 B.R. 119, 121 (Bankr.D.Md.1991) (defense of nondischargeability action not compensable out of estate property); In re Cleveland, 80 B.R. 204, 205 (Bankr.S.D.Cal.1987) (same); see also discussion infra regarding post-petition services.
[4] This is not to say that corporations might not, absent bankruptcy, legitimately pay for such legal services. Rather, the standard of review imposed by § 329, while less stringent than § 330 (actual, necessary services which benefit the estate), still requires that the services benefit the debtor, rather than third parties.
[5] The district court in Ryan commented with regard to § 330(a):

On its face, this language invites a bankruptcy court to consider whether the attorney's services were "necessary" and to pay fees out of the estate if they were. (This reading does raise the further question of to whom the services should be necessary  the debtor or the estate).
Id. That court acknowledged however the "near unanimous view" of decisions interpreting § 330(a) that debtors' counsel should only recover fees "if their labors actually benefitted the estate." Id.
[6] Again, the Ryan court leaves open the question of whether necessity should be viewed from the vantage of the debtor or the estate. Ryan, 82 B.R. at 931. In the view of this court, that issue is easily resolved by looking to the structure of the Code itself, which authorizes professional fees to be paid out of the estate as an administrative expense, i.e., an expense associated with the administration of the estate. 11 U.S.C. § 503(a).
[7] If the professional fails to exercise judgment at the point when the services are rendered, she will still be expected to exercise "billing judgment" at the point when the fee application is being prepared before the application is presented to the court for review and approval. See In re Metro Transportation Co., 107 B.R. 50, 52 (E.D.Pa.1989) ("[t]he standard of . . . § 330 that compensation be made for actual and necessary service, makes the exercise of such "billing judgment" a mandatory requirement in bankruptcy fee matters"); see also Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (attorneys applying to a court for statutory fees should make good faith effort to exclude from the application fees which are excessive, redundant, or otherwise unnecessary).
[*] indicates paralegal
[°] indicates a reduction in fees due to duplication, excessive fee for nature of services, services which are not necessary within the meaning of the statute, and the like.