**In re Douglas L. SAUNDERS, Sr., Debtor.**

**John Patrick LOWE, Trustee, Plaintiff,**

v.

**SHEINFELD, MALEY & KAY, P.C., Defendant.**

**Bankruptcy No. 91–52432–LMC.**

**Adv. No. 92–5052–LMC.**

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

April 9, 1993.

Joel P. Kay, Houston, TX, for debtor and defendant.

Robert L. Barrows, San Antonio, TX, for trustee, plaintiff.

### DECISION AND ORDER DENYING TRUSTEE'S COMPLAINT AND AMENDING DECISION ON FINAL FEE APPLICATION OF SHEINFELD, MALEY & KAY

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the Complaint (the "Complaint") of John Patrick Lowe, Chapter 7 Trustee (the "Trustee") for turnover of money, avoidance of lien and avoidance of pre-petition payments received by Sheinfeld, Maley & Kay ("SMK"), counsel for the Debtor. The Court also issued a Sua Sponte Administrative Order Regarding the Final Fee Application of Sheinfeld, Maley & Kay, P.C. For Approval of Attorneys' Fees to consolidate hearing that matter with the Complaint.

## JURISDICTION

The court has jurisdiction over this proceeding pursuant to 28 U.S.C § 1334(b), (d). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E), (F), (K), and (M).

## I. PERFECTION OF SMK'S SECURITY INTEREST

### INTRODUCTION

The background facts, and accompanying legal analysis, of this Complaint are somewhat lengthy and complex. To briefly summarize, SMK performed various pre-bankruptcy legal services for the Debtor. To secure payment for its services, SMK accepted an assignment of rents generated by the Debtor's interest in a parcel of property owned by a partnership to which the Debtor belonged. As the Debtor could not unilaterally encumber the partnership property himself, the Debtor rather granted SMK a security interest in his rights to the income distribution from the partnership. SMK attempted to perfect its security interest by filing an executed Deed of Trust in the Real Property Records for Bexar County—not an effective procedure for perfecting a security interest in personalty. However, SMK also relies on a letter sent by the Debtor to the partnership, in its capacity as recipient of rent and disburser of monies, which described the collateral and SMK's interest in it. SMK says that this letter is sufficient to perfect its interest under UCC § 9.305. The court agrees with this latter contention, and thus finds that the Trustee was not entitled to avoid SMK's lien or force the turnover of pre-petition payments as preferences. As for post-petition payments received by SMK, they constitute SMK's cash collateral, though in the possession of SMK. The Trustee could avoid the post-petition receipt and application of those monies to the outstanding secured debt, but such avoidance and turnover would not serve a purpose in this case. Furthermore, the Trustee never initiated an action to use the funds or provide SMK with adequate protection, so the Trustee cannot complain about SMK's keeping these monies.

## BACKGROUND

Douglas L. Saunders, Sr., the Debtor, filed his petition under chapter 7 of title 11 of the United States Code on June 28, 1991 (the "Petition Date"). For quite some time, the Debtor was active in the development of real estate in San Antonio. One of the Debtor's real estate interests lies at the heart of this matter.

By deed dated September 21, 1967, the Urban Renewal Agency of the City of San Antonio conferred a certain lot of real property (the "Property") [1] to Mendel S. Kaliff, Billy Joe ("Red") McCombs, David Miller, Douglas L. Saunders, A.D. McCombs and Norman Harwell (collectively referred to as the "Members"). The Members had pooled their monies to collectively purchased the Property, with the intent to lease it. In fact, the Members had already pre-leased the Property to Holiday Inns of America, Inc. ("HIA") (the "Ground Lease").[2] In connection with the Ground Lease, HIA built a hotel on the Property and paid rent to the members under the Ground Lease, based on three percent of room charges, plus one percent of food and beverage sales, plus certain other revenues (the "Rent").

Under the Ground Lease, the Members were permitted to transfer their ownership interests into a Texas corporation. In December, 1967, the Members, exercising their rights under the Ground Lease, conveyed legal title to the Property to Holiday Properties Management, Inc., a Texas Corporation (the "Corporation"), controlled by the Members. In 1975, after the debt against the Property was paid off, the Members dissolved Holiday Properties Management, Inc. The Articles of Dissolution of the Corporation, dated April 15, 1975, indicated that title to the Property

---

1. The Property is located at the intersection of Durango Blvd. and Santa Rosa Street, San Antonio, Texas.

2. A Memorandum of Lease, dated August 15, 1967, was filed in the Real Property Records of Bexar County, Texas. The lease is for a thirty-three year term, with two thirty-three year term renewal options.

was reconveyed to the Members as tenants in common.

After the dissolution of the corporate form, the Members referred to themselves, collectively, as Holiday Properties Management ("HPM"). Each month, HPM receives the Rent from HIA and divides it evenly among the five Members (the "Distribution"). HPM files partnership income tax returns which state that HPM was "formed" on April 16, 1975, the day after the Members voted to dissolve their corporation. HPM sends IRS Forms K–1, "Reports of Partnership Income," to each Member each year. The Debtor's personal tax returns report his income from HPM as partnership income.

The Debtor, in the course of his affairs, has previously granted security interests in his rights to the Distribution and to his underlying partnership interest in HPM. In June, 1978, the Debtor borrowed money from McCombs, one of the other Members, and as collateral, pledged a security interest in and an assignment of his interest in HPM. The pledging document entitled, "Assignment of Partnership Interest" (the "Assignment") provided, in part:

> WHEREAS, the undersigned, Douglas L. Saunders, of San Antonio, Bexar County, Texas, is the present legal and equitable owner of an undivided 20% interest in and to *Holiday Properties Management, a general partnership composed of Douglas L. Saunders, Billy J. McCombs, Norman Harwell, Mendel S. Kaliff and David Miller, Trustee, said partnership being the successor-in-interest of all assets and liabilities of Holiday Properties Management, Inc.,* a Texas Corporation dissolved on April 15, 1975, and in addition, the undersigned is the owner of an undivided 20% interest

in and to certain real property (emphasis added).[3]

The Assignment also explains that HPM owns the Property and the Rent therefrom. The Assignment of Partnership Interest was recorded in the Real Property Records of Bexar County, Texas. The three remaining HPM Members, Messrs. Harwell, Kaliff and Miller, acknowledged the assignment of the Debtor's partnership interest and agreed that, in the event of a default, each would accept McCombs as a partner (the "Acknowledgement"). The Acknowledgement provided, in pertinent part:

> The undersigned, being the remaining general partners of Holiday Properties Management, hereby agree and consent to the above assignment of a 20% undivided partnership interest in Holiday Properties Management, a general partnership by Douglas L. Saunders to Billy J. McCombs, together with the rights to collect and receive income, rents, and other rights, and in addition, to the execution and delivery of security instruments and a Deed of Trust as to the real property owned by the individuals comprising Holiday Properties Management, a general partnership.[4]

Enter SMK. SMK is a well respected Texas law firm and was retained by the Debtor in several bankruptcy-related matters.[5] In June, 1990, the Debtor executed a Deed of Trust, Security Agreement and Financing Statement (collectively, the "Deed of Trust"), in favor of SMK for the purpose of securing payment of SMK's fees. Pursuant to the Deed of Trust, SMK was assigned the Debtor's rights in the Property, including his portion of the Distribution. SMK filed the Deed of Trust in the Real Property Records of Bexar County, Texas. The Debtor also sent written

---

**3.** The Debtor also executed a UCC–1 financing statement in favor of McCombs.

**4.** In June 1990, McCombs released his security interest in the Debtor's interest in HPM.

**5.** SMK represented the Debtor's individual interests in the chapter 11 case of Elm Creek Holding Co., Ltd., incurring $5,431.05 in fees. SMK represented the Debtor, again individually, in the chapter 11 case of Boerne Stage Road Joint

Venture, incurring $10,717.26 in fees. SMK represented a business entity owned by the Debtor, Woodlake Holding Company, Ltd. as counsel to the debtor in possession. This last case has since been converted to chapter 7 and SMK has rendered $26,836.99 in services. SMK is also serving as counsel of record for the Debtor in the instant bankruptcy, and has charged the Debtor $15,925.50 (the court allowed $15,824.00 in fees).

notice to Holiday Properties Management, directing the HPM manager to pay all of the Debtor's monthly Distribution directly to SMK. SMK, however, did not file a UCC–1 financing statement.

Since June, 1990, SMK has received approximately $2,000.00 per month from HPM's checking account, totalling $63,300, as of the date of this hearing. Each month, SMK allocates the Disbursement to one of the outstanding receivables due from the Debtor. Since the filing of this action, SMK has deposited the Disbursements in its trust account.

After the Debtor filed his own chapter 7 petition, the Debtor often described HPM as a partnership. He Debtor declared on the Schedules of the Petition that his assets include, *inter alia*, a 20% interest in "Holiday Properties Management (a partnership)." In his Statement of Financial Affairs, the he disclosed that he had transferred to SMK his interests in the Ground Lease via the Deed of Trust. At the Section 341 meeting on August 6, 1991, the Trustee asked about the Debtor's interest in Holiday Properties Management. The Debtor responded that HPM was a partnership, naming the Members as his partners.

### *DISCUSSION*

*1. HPM is a Partnership*

■ Initially, we must determine whether HPM is a partnership. If it is, then what SMK has a lien on is the Debtor's interests in the partnership, a personal property interest. If no partnership exists, then SMK was assigned an interest in the Debtor's real property. The procedures for perfecting a security interest in real property and personal property differ in Texas.

■ The existence of a partnership under Texas law is a question of fact. *Arnold v. Caprielian*, 437 S.W.2d 620, 625 (Tex.Civ.App.—Tyler 1969, writ ref'd n.r.e.). No single fact is determinative, and each case turns on its own particularities, considering the presence or absence of the usual attributes of a partnership relation. *Jenkins v. Brodnax White Truck Co.*, 437 S.W.2d 922, 925 (Tex.Civ.App.—Tyler 1969,

no writ). The Texas Uniform Partnership Act defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." TEXAS UNIFORM PARTNERSHIP ACT, Tex.Rev.Civ. Stat.Ann., art. 6132b § 6 (Vernon 1970) ("TUPA"). A partnership is relationship between two or more persons engaged in a common enterprise and community interest therein for the benefit of the parties, with each party sharing the right to participate in profits and the obligation to share in the losses. *See Conrad v. Judson*, 465 S.W.2d 819, 826 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.), *cert. denied*, 405 U.S. 1041, 92 S.Ct. 1312, 31 L.Ed.2d 582 (1971).

■ While the mere ownership of property as tenants in common and the sharing in the profits from the property does not, without more, constitute a partnership, *see* TUPA § 7; *M. Lit., Inc. v. Berger*, 170 A.2d 303, 305 (Ma.Ct.App.1961), the court is persuaded by the surrounding facts and circumstances in this case which support a finding of partnership. *Cavazos v. Cavazos*, 339 S.W.2d 224, 226 (Tex.Civ.App.—San Antonio 1960, writ ref'd) (partnership may be determined by review of surrounding facts and circumstances). The Members did not execute a writing establishing HPM as a partnership, but under Texas law, a writing is not an absolute prerequisite to the formation of a partnership. *Cavazos*, 339 S.W.2d at 226. The intent of the parties is the most important test in determining whether a partnership exists. *Fed. Sav. & Loan v. Griffin*, 935 F.2d 691, 700 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992). Affirmative intent to form a partnership is not the test; all that is necessary is an intent to undertake some joint action:

> It is the intent to do the things that constitute a partnership that determines that the relationship exists between the parties and if they intend to do a thing which in law constitutes a partnership, they are partners whether their expressed purpose was to create or avoid the relationship.

*In re Cooper*, 128 B.R. 632, 636 (Bankr. E.D.Tex.1991) (citing *Howard Gault &*

*Sons v. First Nat'l Bankr of Hereford,* 541 S.W.2d 235, 237 (Tex.Civ.App.—Amarillo 1976, no writ)). Here, the Members originally intended to purchase and lease the Property for profit. In fact, the Ground Lease was executed before the Members even owned the Property. After the dissolution of the Corporation,[6] the Members continued to own the Property and share profits from the Rent.[7]

HPM functions as a partnership, and the Debtor and the Members held out HPM to the public as a partnership. HPM receives the Rent and makes equal Distributions of income to the Members.[8] *Blair v. Rindy,* 358 S.W.2d 685, 688 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.) (sharing of profits is evidence of partnership). The Debtor identified HPM as a partnership in several loan transaction documents, as well as in his bankruptcy petition and accompanying schedules. *Brewer v. Big Lake State Bank,* 378 S.W.2d 948, 951 (Tex.Civ.App.—El Paso 1964, no writ) (parties' acts and representations may be evidence of partnership in favor of those who must be guided by external implications). The Members further affirmed the existence of a partnership by signing the Acknowledgement of Assignment incident to McCombs in 1978. The Members adopted the HPM name, hold at least one bank account in that name, and file federal partnership tax returns.[9] Each Member filed annual K–1 partnership income tax reports. *Fuller v. Fuller,* 518 S.W.2d 250, 251–52 (Tex.Civ. App.—Beaumont 1974, writ ref'd n.r.e.) (partnership found where organization had name, members call each other partner, filed partnership tax returns); *Halstead v. Commissioner,* 296 F.2d 61, 62 (2nd Cir. 1961) (organization which for nine years filed partnership tax returns and its members filed K–1 partnership income reports estopped from denying partnership).

Taken together, these facts lead the court to concluded that HPM is a partnership.

## 2. Nature of the Property on Which SMK has a Lien

■ Given that HPM is a partnership, the Property and the Rent it generates are partnership property. The Property was purchased for the partnership. "All property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership, is partnership property." TUPA § 8. The Property, upon dissolution of the corporation, was conveyed to the Members of the HPM partnership. Under Texas law, title to partnership property may be held in the name of the partnership or in the name of one or more of the partners. TUPA § 10. In fact, when the Debtor executed his Assignment of Partnership Interest in 1978, the document stated that HPM was "the successor-in-interest of all the assets and liabilities of Holiday Properties Management, Inc." The Property was formerly an asset of the Corporation, and after dissolution became an asset of the partnership.[10] The remaining members acknowledged this when they executed the Acknowledgement of Assignment of Partnership Interest. *Conrad v. Judson,* 465 S.W.2d 819, 828 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.), *cert. denied,* 405 U.S. 1041, 92 S.Ct. 1312, 31 L.Ed.2d 582 (1971) (absent appearance of contrary intention, property apparently acquired with partnership funds was properly held to be partnership asset). It is from this asset

---

**6.** The corporation was dissolved as the debt against the Property was paid off and the Members no longer needed the corporate form to shield themselves from personal liability.

**7.** The Members could not maintain their interests if they did not share the losses—though losses were highly unlikely, according to HPM's spokesperson.

**8.** Absent agreement to the contrary, partners share losses equally. TUPA § 15.

**9.** *But see, Taylor v. Lewis,* 553 S.W.2d 153, 158 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.) (filing of federal partnership tax return does not as matter of law determine existence of partnership).

**10.** As previously noted, partnership property may be held in the name of one or more of the partners. TUPA § 10. In the case of HPM, the Property was held in the names of all the partners.

that the partnership profit is generated. Easily, the Property and its Rents are property of the partnership.

■ Because the Property is a partnership asset, the Debtor, as a member of the partnership, could not unilaterally grant an interest in it. Property belonging to a partnership does not belong to the partner as his separate property, *see Hogan v. Hogan*, 234 Ark. 383, 352 S.W.2d 184, 187 (1962), nor is it assignable by a single partner, except in connection with the assignment of the rights of all the partners in the same property. TUPA § 25. Although a member of a partnership owns an interest in the partnership thereby owns an interest in its property, the partner does not hold title to any specific property belonging to the partnership. *Littleton v. Littleton*, 341 S.W.2d 484, 488 (Tex. Civ.App.—Houston 1961, writ ref'd n.r.e.). Therefore, the Debtor could not unilaterally grant a security interest in the Property and the Rents themselves, as those are HPM partnership assets. TUPA § 27 (partner can grant lien against his partnership interest, in particular, in his rights to receive profits and surplus.); TUPA § 26 (partner's interest is personal property, and is not an interest in the specific property of the partnership).

■ Therefore, when the Debtor granted SMK a security interest, what he conveyed was an interest in his partnership, *i.e.*, his right receive his share of the Distribution. The rights of a partner in a partnership are his rights in specific partnership property, his interest in the partnership, and his right to participate in management. TUPA § 24. By distinguishing between the assignees of

partnership interest and the admission into the partnership of new partners, TUPA § 27(1) operates to allow the conveyance of a right to receive profits without giving the assignee an interest in partnership assets. *Thomas v. American National Bank*, 704 S.W.2d 321, 323 (Tex.1986). Therefore, what the Debtor was granted was a security interest in his personal property, and not in the real property and rents therefrom, because the latter are partnership assets, not his assets.

### 3. SMK Lien is Perfected

■ The Trustee argues that the SMK security interest is unperfected and that the Trustee is entitled to avoid the SMK lien under 11 U.S.C. § 544, and to recover all pre-petition payments as avoidable preferences under 11 U.S.C. § 547(b). SMK argues that it has a perfected lien on the Property, the Ground Lease and Rents thereunder by virtue of the filing of the Deed of Trust in the Real Property Records of Bexar County. The Trustee counters that SMK is unperfected by this filing because SMK has a lien not on real property, but on personalty, and SMK did not file a UCC–1 Financing Statements.[11] Because SMK did not file UCC–1 financing statements, the SMK lien is unperfected.

While SMK did indeed fail to file UCC–1 financing statements, its lien is nonetheless perfected, not by the Deed of Trust filing, but by the letter of June 4, 1990, sent to HPM by the Debtor.[12] By this letter (the "Letter"), the Debtor informed HPM that SMK had a security interest in his Distribution.[13]

---

**11.** With minor exceptions, a UCC–1 financing statement must be filed to perfect all security interests in personal property. Tex.Bus. & Comm. Code § 9.302 (Vernon 1991).

**12.** The letter stated, in pertinent part:
Pursuant to that certain Promissory Note (the "Note") of even date herewith executed by me to Sheinfeld, Maley & Kay, a Professional Corporation ("SMK") in the original face amount of $19,000.00 and pursuant to that certain Deed of Trust of even date herewith executed by me to Michael Leppert, Trustee, securing the Note, which, among other things, secures my interest in the property

covered by the Lease, I have agreed to direct the payment of all rentals owed to me under the Lease to SMK.
Therefore, until joint notification from SMK and me, you are hereby directed to pay all rentals arising under the Lease, attributable to my percentage interest, directly to SMK at their offices, 3700 First City Tower, Houston, Texas 77002.

**13.** The Letter also contained a description of the collateral and was signed by the Debtor, SMK gave value for the security interest and the Debtor had rights in the Rents pursuant to the Ground Lease. The Letter satisfied the formal

The Letter was sent to HPM, as recipient of the Rent and disburser of the Distribution. Tex.Bus. & Comm.Code § 9.305 provides that a secured party can perfect its security interest in money if the money is in possession of a bailee and the bailee receives notification of the secured party's interest. SMK argues, and the court agrees, that SMK had a security interest in money and that that security interest was perfected when the Letter was received by HPM in its capacity as bailee.

A line of cases holds that an entity under the direct control of the debtor may not serve as the bailee for § 9.305 purposes. *See, e.g., In re Copeland,* 531 F.2d 1195, 1204 (3rd Cir.1976) ("bailee with notice" may not be entity controlled by the debtor); *Arizona Farmers Production Credit Ass'n v. Northside Hay Mill & Trading Co.,* 153 Ariz. 333, 736 P.2d 816, 3 UCC Rep.Serv.2d 776 (1987) (bailee under control of debtor could not be bailee to perfect security interest); *In re Hill,* 7 B.R. 433 (Bankr.W.D.Okla.1980) (possession of collateral by debtor or person closely associated with debtor is insufficient to perfect security interest). However, HPM, although a partnership of which the Debtor is a part owner, is not *controlled* by the Debtor. The Debtor has a 20% interest in HPM, not a controlling one. *See In re Bragiel,* 151 B.R. 186 (Bankr.N.D.Ill.1993). In *Bragiel,* the bankruptcy court found that a law firm in which a debtor was a partner could nonetheless qualify as a § 9.305 bailee. "Notwithstanding the Debtor's status at the firm as a "partner," there is no suggestion that the Debtor controlled the Firm or even that the Debtor appeared to control the Firm. A bailee may owe duties to both the debtor and the secured party and yet be a bailee under § 9–305." *Id.* at 189. SMK's security in-

terest was perfected when HPM received the Letter. Accordingly, the Trustee may not avoid the SMK lien under § 544. Furthermore, since the SMK lien was perfected, the Trustee may not recover the pre-petition payments either.[14] 11 U.S.C. § 546(b).

### 4. *SMK'S Rights in the Distributions Post–Petition*

The Trustee asserts that, even if the SMK lien was perfected, which it was, SMK was nevertheless entitled to receive the Distributions post-petition because SMK failed to seek permission of the court to continue to so receive the Distributions. In fact, the shoe was on the other foot—the Trustee was the one with a duty to come forward with pleadings under § 363(b).

SMK's properly perfected pre-petition security interest was not extinguished by the filing of the Debtor's bankruptcy petition, and SMK's security interest in the proceeds of the Debtor's partnership interest continued after bankruptcy. 11 U.S.C. § 552(b); *see In re Coones,* 954 F.2d 596, 601 (10th Cir.1992). The Distributions post-petition were "cash collateral," in which SMK had a prior perfected lien. 11 U.S.C. § 363(a).[15] Section 363 does not create a property interest in the trustee in cash collateral to the exclusion of the secured creditor. Rather, that section protects the interests of the party with the pre-existing interest in the cash collateral. *See Matter of Village Properties,* 723 F.2d 441, 444 (5th Cir.), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984). "Rents collected by the creditor/mortgagee pre-petition and applied to the debt are … lost to the estate. These are clearly no longer assets of the estate, for they are no

requisites of a security interest under the UCC. Tex.Bus. & Comm.Code § 9–203(a).

**14.** As discussed herein, the court has also concluded that the fees secured by the SMK lien are reasonable and compensable under the Bankruptcy Code.

**15.** 11 U.S.C. § 363(a) provides:
In this section, "cash collateral" means cash, negotiable instruments, documents of title, se-

curities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.
11 U.S.C. § 363(a).

414

longer property of the estate. Rents collected and held by the creditor (post-petition), however, remain cash collateral—the debt not having been reduced—and are cash collateral *in the possession of the creditor.*" *In re Tripplet,* 84 B.R. 84, 89 (Bankr.W.D.Tex.1988) (emphasis added).

■ While SMK's receipt of the post-petition Distributions constituted cash collateral in its possession, the application of the monies received to the outstanding debts clearly violated the automatic stay. Furthermore, the Trustee is authorized, under 11 U.S.C. § 549, to avoid the post-petition transfers of estate property. Although a technical violation of section 362 of the Bankruptcy Code did occur, and the Trustee is empowered to avoid post-petition transfers, the facts of the case at bar do not warrant further action by the court.

Section 549 of the Bankruptcy Code provides, subject to some exceptions not applicable to the instant case, that a Trustee may avoid any post-petition transfer of property of the estate that is not authorized by the Bankruptcy Code or the Court. 11 U.S.C. § 549. While SMK's *receipt* of the Distribution post-petition was not, of itself, a violation of the Bankruptcy Code, the *application* of those monies to SMK's secured claim was a transfer of property of the Debtor's estate in violation of the automatic stay. *See* 11 U.S.C. § 362(a)(6) (automatic stay violated by any act to collect, assess or recover any pre-petition claim against a debtor). Such violations of the stay are voidable, and the monies applied to the SMK's secured claim do not, therefore, lose their character as property of the Debtor's estate. *See Picco v. Global Marine Drilling Co.,* 900 F.2d 846, 850 (5th Cir.1990) (citing *Sikes v. Global Marine, Inc.,* 881 F.2d 176 (5th Cir.1989)).

As SMK perfected its pre-petition lien on the Debtor's partnership interests, and that lien extended to the proceeds and profits of those interests, SMK's lien continued post-petition. 11 U.S.C. § 552(b). In spite of the secured nature of SMK's lien, SMK's

transfer of property of the estate to reduce that secured lien is not protected from the broad powers of the Trustee to avoid post-petition transfers. *See, e.g., In re Fort Dodge Creamery Co.,* 121 B.R. 831, 836 (Bankr.N.D.Iowa, 1990) ("[t]hat the post-petition payment might have been made from the proceeds of the liquidation of the transferee's collateral is not a defense to the trustee's avoidance power under § 549(a)"). "[T]he fact that the post-petition payment was applied to a secured note does not prevent avoidability." *See In re Wilson,* 52 B.R. 639, 641 (Bankr.E.D.Tenn. 1985).

■ While the Trustee may avoid the post-petition transfers to SMK pursuant to § 549, such avoidance makes little practical sense in this case. *See, e.g., In re ASI Reactivation, Inc.,* 934 F.2d 1315, 1321 (4th Cir.1991) (court questions benefit to estate by seeking to avoid transactions under § 549). The case is one under chapter 7, and the Trustee is charged with the duty to expeditiously collect and reduce to money the property of the estate for distribution to the creditors. 11 U.S.C. § 704(1). SMK is already in possession of the monies on which it has a secured lien. If SMK were compelled to turn over these monies to the Trustee, the Trustee would merely return the same exact sum of money back to SMK upon distribution of the estate.[16] *In re Willmar Nursing Home,* 1991 Westlaw 172017, Westlaw *4 (Bankr.D.Minn.1991) (recovery of post-petition payments to secured creditor of little benefit to estate since recovered payments still subject to creditor's secured lien). The Trustee has not asserted a valid need or use for the cash collateral at this late date. *See* 11 U.S.C. § 363. Even if such a use or need existed, the Trustee has neither offered nor provided adequate protection for SMK's lien. 11 U.S.C. § 363(c)(2); § 542; *Village Properties,* 723 F.2d at 444. Since adequate protection was neither offered nor provided by the Trustee, and SMK did not otherwise consent to the Trustee's use of

---

**16.** Since it is unlikely that the Trustee could show a benefit to SMK, it is highly improbable that the Trustee could charge his fees and expenses for collecting the cash collateral against that property under 11 U.S.C. § 506(c).

the Distributions, SMK's was within its rights to continue to receive the Distributions post-petition, and absent such a showing, the court will not compel turnover of the monies.

At least one court has considered similar facts and has concluded that the post-petition transactions made in that case should not be undone:

> Technically, [the Debtor] should not have made the payment without court authorization. Nevertheless the court is not going to undo the transaction, for the reason that [the Debtor] was bound to pay, sooner or later, [the secured creditor's] charges. Further, to restore [the secured creditor] to its pre-transaction position would require that [the secured creditor] be restored to the position of a perfected secured creditor holding a presently enforceable lien. The court sees little point in generating a flurry of paperwork to achieve the same result as has been achieved by [the Debtor's] payment [of the post-petition transaction].

*See In re Dave Noake, Inc.*, 45 B.R. 555, 557 (Bankr.D.Vt.1984). The case at bar presents an analogous situation. While the court does not condone unauthorized transfers of estate property, SMK is in no better or worse situation now by its retention of the cash collateral and part application to the outstanding secured debt. Furthermore, the estate would not benefit from the Trustee' possession and use of the cash collateral. Even if a benefit did exist, the Trustee has not offered adequate protection to SMK to protect its lien. Clearly, the estate would suffer if SMK were compelled to turnover the cash collateral to the Trustee. The Trustee's compensation, statutorily based on the monies distributed, would increase substantially, without any corresponding benefit to the estate. *See* 11 U.S.C. § 326. The court, therefore, will not allow the Trustee to avoid the post-petition transfers and compel their turnover.

### CONCLUSION

The court concludes, for the reasons stated above, that SMK properly perfected its security interest in the Distribution, and thus the lien is not avoidable by the Trustee. As the SMK lien was perfected, the Trustee may not recover as preferences the Distributions received pre-petition. Furthermore, the post-petition payments received were cash collateral in the possession of SMK, and the Trustee was not entitled to their receipt absent the initiation of a proper action and the provision of adequate protection to SMK. Finally, the court sees no legitimate purpose to permit the Trustee to avoid the post-petition transfers under 11 U.S.C. § 549. The Trustee's Complaint is, therefore, dismissed.

## II. AMENDMENT OF DECISION AND ORDER ON FINAL FEE APPLICATION OF SHEINFELD, MALEY & KAY, P.C.

The court also entertained the Trustee's Motion to Alter or Amend Order Regarding Final Fee Application of Sheinfeld, Maley & Kay, P.C. For Approval of Attorneys Fees (the "Motion"). Via the Motion, the Trustee seeks an alteration of those portions of the court's order which granted administrative priority status for the SMK fees incurred for all services rendered up to one year before the filing of the petition, including SMK's representations of the Debtor in other bankruptcy matters and SMK's counseling of the Debtor to file a "short year tax return." Upon consideration thereof, the court concludes that the following amendments will be added to the court's prior order for clarification, but the order is substantively sound and needs not to be altered.

### A. Standard of Review

Section 330(a) of the Bankruptcy Code provides that a court may award compensation to a debtor's attorney for services rendered by the attorney. 11 U.S.C. § 330(a)(1). The burden of proof with respect to the services falls upon the attorney seeking compensation. *Continental Ill. Bank & Trust Co. v. Charles N. Wooten, Ltd. (In re Evangeline Refining Co.)*, 890 F.2d 1312, 1326 (5th Cir.1989) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433–

34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983)).

▮▮▮ Pre-petition fees are reviewed under a "reasonable value" standard. *See* 11 U.S.C. § 329(b); *In re Office Products of America, Inc.*, 136 B.R. 964, 970–72 (Bankr.W.D.Tex.1992). An attorney representing the debtor must file an application for compensation paid or agreed to be paid for services rendered within one year prior to the filing of the petition in contemplation of or in connection with the bankruptcy case. *See* 11 U.S.C. § 329(a).

When reviewing the reasonableness of the pre-petition services rendered by a attorney to a debtor, the court may look to the guidelines established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) (as applied to bankruptcy in *Matter of First Colonial Corp. of Am.*, 544 F.2d 1291, 1298–99 (5th Cir.), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977)).[17] *See In re Temple Retirement Comm., Inc.*, 97 B.R. 333, 338 (Bankr.W.D.Tex.1989) (citing to state bar rules then in effect); *In re Office Products of Am., Inc.*, 136 B.R. 964, 972 (Bankr. W.D.Tex.1992); *see also* Rule 1.04, Texas Disciplinary Rules of Professional Conduct, 3 GOV'T CODE, art. 10 § 9 (West Pamphl. ed. 1992) (substantially restating requirements for reasonable fees found in former Disciplinary Rule 2–106).

## B. Review of SMK Fee Application

The Trustee argues that since many of SMK's services were in connection with cases other than the Debtor's individual case, the Debtor's estate was not benefitted, and the fees for those services should not be granted administrative priority status.

▮▮▮ Initially, the court notes that even though SMK's fees are secured by a validly perfected lien, the lien is "enforce-able only to the extent, and in the amount, determined to be reasonable by the Court." *See In re Leiden Corp.*, 59 B.R. 239, 239 (Bankr.D.R.I.1986). Furthermore, the court has the authority under § 329(a) to review all fees for SMK's services rendered in contemplation or connection with this bankruptcy. SMK cites *In re Hargis*, 895 F.2d 1025, 1026 (5th Cir.1990), stating that, since they are unrelated to this bankruptcy case, this court has no authority to review the fees and expenses incurred in the representation of the Debtor in the *Elm Creek* and *Boerne Stage Road* cases. However, the Court views those efforts as, while possibly not rendered in contemplation of this bankruptcy, clearly rendered in connection with this bankruptcy, as the downfall of the Debtor's real estate portfolio was a leading cause of his individual bankruptcy. *See In re Command Services Corp.*, 85 B.R. 230, 232 (Bankr.N.D.N.Y.1988). Therefore, the court has the authority to review the fees incurred in those case, since they were paid by this debtor and were incurred in connection with this case.

▮▮▮ The Trustee argues, essentially, that since the services were rendered in other matters, those services could not have benefitted this estate. Benefit to the estate, however, is not the principal concern when reviewing pre-petition fees. *See Office Products*, 136 B.R. at 971. Pre-petition fees are governed by the more relaxed "reasonable" standard, as opposed to the more stringent "actual and necessary" standard employed in reviewing post-petition fees. *Compare* 11 U.S.C. § 329(b) *with* 11 U.S.C. § 330(a).

▮▮▮ The differing standards employed in pre-petition and post-petition fee review stems from the differing duties an attorney owes in those time periods. During the pre-petition period, the attorney owes a duty of zealous representation to his or her client. Post-petition, the attorney owes a

---

**17.** The twelve factors established in *Johnson* include the time and labor required; the skill required to perform the service properly; the preclusion of other employment by acceptance of the case; the customary fee; whether the fee is fixed or contingent; the time limitations imposed; the amount involved and the results obtained; the experience, reputation and ability of the attorney; the nature and length of the professional relationship between the attorney and the client; the undesirability of the case; and awards in similar cases. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (1974).

duty to the estate, whose beneficiaries are the creditors, to maximize recovery. *See Office Products,* 136 B.R. at 971. The reasonableness standard is employed pre-petition in part because the potential debtor may never become an actual debtor. If, through the efforts of the attorney, the potential debtor/client manages to avoid bankruptcy, the attorney would certainly be entitled to compensation for the reasonable value of his or her services. As previously noted, the reasonable value of those services are examined in light of the *Johnson* factors. In its initial decision, the court reduced the SMK fee application with regard to the pre-petition services to a an amount which the court deemed reasonable in light of the *Johnson* factors. With this review, the court has uncovered no other reasons to further reduce the fee award.

 The Trustee also argues that if the SMK's pre-petition fees are allowed, they should not be granted administrative priority status under 11 U.S.C. § 503(b) and 507(a). The Debtor incurred approximately $15,925.50 in pre-petition fees for services from SMK. Of that amount, approximately $2,812.00 was for services rendered on behalf of entities other than this estate. It is generally held that an attorney's pre-petition services do not qualify for administrative priority, because they do not normally make a substantial contribution to the administrative process of a bankruptcy case. *See, e.g., In re Kahler,* 84 B.R. 721, 723 (Bankr.D.Colo.1988).

The court, in its prior decision, noted the "intimate nature of the relationship between this Chapter 7 debtor and the various related entities." In fact, SMK's zealous representation of the Debtor's interests in these related matter no doubt put off the Debtor's filing of his own petition, enabling creditors to receive payments outside of the preference period. The receipt of those payments effectively reduced the amount of claims now outstanding against this estate. Furthermore, SMK's services prevented depletion of the assets of the Debtor, *i.e.,* those that eventually became property of the estate. For example, in the *Boerne Stage Road* case, SMK filed the

Chapter 11 case to preserve the Debtor's interest in a tract of land in which he had invested over $5,000,000.00. In the *Elm Creek* case, a Chapter 11 Plan of Reorganization was confirmed, and the Debtor's interest in Elm Creek as well as certain of its property were preserved. Accordingly, the court concludes that there was benefit to this estate from these various pre-petition services, sufficient to warrant their allowance, as previously adjusted by the court, as administrative expenses under 11 U.S.C. §§ 503(b) and 507(a).

 Secondly, the Trustee complains that SMK's counseling of the Debtor to make a "short year" tax election under 26 U.S.C. § 1398 should not be granted administrative priority. SMK contends that the "short year" election actually benefitted the estate.

26 U.S.C. § 1398 provides that a debtor may make a "short year" tax election. By doing so, the debtor breaks the calendar year into two short years, one beginning on January 1 and ending on the day prior to the Petition Date. The second short year begins on the Petition Date and ends on December 31 of that year. When a short year election is made, taxes due on the first short year become a priority claim against the estate and to the extent that there are funds in the estate, the trustee is required to treat that claim as a priority claim under 11 U.S.C. § 507(a)(7)(A)(i). Furthermore, the claim is not dischargeable. 11 U.S.C. § 523(a)(1)(A). If the debtor fails to make a short year election, the debtor generally files a tax return for the entire calendar year, but any tax due for that year is a claim solely against the debtor, individually, and not the estate. *In re Gonzalez,* 112 B.R. 10, 12 (Bankr.E.D.Tex.1989); *In re Turboff,* 93 B.R. 523, 526 (Bankr.S.D.Tex. 1988).

While a short year election may in some cases operate to the detriment of the estate by increasing the priority tax claims against the estate, that was not the result in this case. Although the Debtor made the short year election, no tax liabilities were generated. Furthermore, according to SMK, the sole purpose of the election

was to facilitate the Debtor's use of net operating loss carry forwards to eliminate any priority tax claims for the short period, thus actually increasing the amount of money available for distribution to creditors. Accordingly, the court finds that SMK's pre-petition services with regard to the short year election counseling benefited the estate, and the fees for those services were properly granted administrative priority.

### CONCLUSION

For the reasons stated above, the Court's decision is amended to the extent stated herein.

So **ORDERED.**