**In re The BENNETT FUNDING GROUP, INC., Bennett Receivables Corporation, Bennett Receivables Corporation II, Bennett Management and Development Corporation, Debtors.**

**Bankruptcy Nos. 96–61376 to 96–61379.**

United States Bankruptcy Court, N.D. New York.

Feb. 5, 1997.

---

Simpson Thacher & Bartlett, New York, NY (M.O. Sigel, Jr., of counsel), for § 1104 Trustee.

Wasserman, Jurista & Stolz, Millburn, NJ (Daniel Stolz, of counsel), for Unsecured Creditors Committee.

Guy Van Baalen, Utica, NY, Assistant U.S. Trustee.

Hancock & Estabrook, L.L.P., Syracuse, NY (Stephen A. Donato, of counsel), Bond, Schoeneck & King, L.L.P., Syracuse, NY (James Dati, of counsel), Costello, Cooney & Fearon, Syracuse, NY (Michael Balanoff, of counsel), Green & Seifter, P.C., Syracuse, NY (Virginia Hoveman, of counsel), for Various Banks.

Melvin & Melvin, Syracuse, NY (James Hoare, of counsel), for Citrus Bank.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

The Court has before it the First Interim Fee Application of Simpson Thacher & Bartlett ("STB"), attorneys for Richard C. Breeden ("Trustee"), which seeks payment of $2,118,316 in fees and $295,149 in disbursements.[1] This fee application was filed on August 23, 1996, and scheduled for a hearing on September 12, 1996. The hearing was thereafter adjourned until October 10, 1996, and then subsequently adjourned to November 14, 1996, December 12, 1996, and finally to January 9, 1997.

Anticipating the magnitude of the fee applications to be filed in these cases, the Court *sua sponte* filed an Order to Show Cause, dated September 5, 1996 ("OSC"), to consider the appointment of a fee auditor. A hearing was held regarding the OSC on September 26, 1996, and the parties were offered the opportunity to object to the proposed appointment. At the conclusion of the hearing, the parties were invited to submit proposed orders regarding the appointment of a fee auditor by October 4, 1996. After due consideration and sufficient cause appearing for the appointment of a fee auditor, the Court appointed the firm of Stuart, Maue, Mitchell & James, Ltd. ("Fee Auditor"), to function in this capacity in these cases by Order dated October 15, 1996.[2]

STB agreed to delay the hearing on its fee application until the Fee Auditor reviewed the application and issued a report ("Report"). At the hearing on October 10, 1996, however, the Court authorized a temporary award of $1,000,000 in fees and $100,000 in disbursements to STB while the Fee Auditor completed its Report. The Fee Auditor submitted its Report of STB's first fee application on December 23, 1996. STB was then given an opportunity to reply to the findings of the Fee Auditor and objections to STB's fee application filed by the United States Trustee ("UST") and other parties. A hearing was then held at a regular motion term in these proceedings on January 9, 1997, at Utica, New York. The Court reserved decision, opting instead to issue a written Decision due to the importance of the issues involved.[3]

---

1. STB initially requested $2,108,536 in fees and $298,426 in the First Interim Fee Application. After issuance of the report of the Fee Auditor in these cases, however, STB modified its request to reflect the amounts listed above in the text.

2. This Order was subsequently superseded by an Amended Order Appointing Fee Auditor and Directing Related Procedures and Standards Concerning the Interim Payment of Compensation and Consideration of Fee Application, dated December 2, 1996 ("Amended Order").

3. In the interest of judicial economy, sections of this Decision which discuss conclusions of law and their application to fee applications generally are utilized in other Decisions issued concurrently herewith. Due to the large volume of fee

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a), (b)(1) and (b)(2)(A) and (O).

## FACTS AND ARGUMENTS

The Order appointing the Fee Auditor and the Amended Order were made applicable to all professionals in these jointly administered cases employed or to be employed pursuant to section 327 or 1103 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"). The aforementioned Orders provided the authority and the guidelines for professionals regarding the process to be employed in submitting fee applications to the Fee Auditor and to the Court. In accordance with its responsibilities, the Fee Auditor performed a review and analysis of STB's First Interim Fee Application pursuant to the Amended Order, and submitted a Report in order to assist the Court in its analysis of the fee application. The Fee Auditor identified various time and expense entries that appeared to violate Court guidelines or that were brought to the Court's attention for further review.

STB provided specific responses to the Report of the Fee Auditor. Initially, STB argues that its application should be reviewed utilizing a market analysis approach, such that services that it is compensated for by other clients in its market should be compensable in this case. STB reiterates this argument in support of its higher hourly rates. STB also asserts that it should be compensated for services rendered prior to the firm's formal retention, since the circumstances surrounding its employment satisfy the prevailing "excusable neglect" standard justifying nunc *pro tunc* employment in the Second Circuit.

In response to entries which were labeled by the Fee Auditor as vaguely described

applications before the Court and the similarity of issues presented by each, reliance upon research already completed will yield uniformity and economies of scale.

4. Objections to STB's fee application were also filed by various parties prior to the appointment

tasks, STB submitted additional supporting documentation in an effort to clarify for the Court the nature of the services performed. In addition, STB objected to the categorization of a number of entries as administrative or clerical tasks, and further argued that such tasks must nonetheless be examined under the market analysis discussed above.

Other points objected to by STB include, *inter alia,* questions relating to their firm staffing and hourly rates, conferences between members of the firm and with the Trustee, unreceipted expenses, office overhead, word processing time, and overtime meals and transportation.

Various objections to STB's fee application were filed in response to the findings of the Fee Auditor.[4] The UST specifically objects to any compensation for pre-retention fees or expenses, the excessive "real" blended hourly rate of the attorneys involved, and the multiple attendance at hearings and "double billing" for intra-office conferences, where more than one professional is billing for time expended in the intra-office conference. In addition, the UST objects to the amount requested for services related to the retention of the Trustee and STB's own retention. In an objection filed September 30, 1996, the UST also requested that a certain percentage of compensation be "held back."

The Official Committee of Unsecured Creditors ("Committee") has objected to STB's billing rates and the percentage of time consumed by partners of the firm on this case, specifically noting that the blended rate of partners and associates is $306. The Committee has also noted its concern with respect to compensation sought for services rendered prior to STB's retention, the amounts classified as administrative or clerical tasks, and for amounts reflecting time spent on the Trustee's retention and for performing conflicts checks related to STB's retention.

of the Fee Auditor. The Court has reviewed and considered these objections, but will not detail concerns asserted in them in this Decision since they essentially object to areas highlighted by the Fee Auditor or have been otherwise addressed in this Decision.

In response to the objections filed by the UST, STB reiterates its market rate analysis argument regarding compensation, and also argues that a "holdback" of compensation would effectively penalize the firm. Furthermore, STB objects to the characterization as "double billing" the time spent in intra-office conferences and for multiple attendance at events, as such time spent is necessary and appropriate. Lastly, STB argues that the time spent relating to the election of the Trustee, the meeting of creditors and its own retention was necessary and reasonable. Specifically, STB argues that time spent regarding the election of the Trustee was intertwined with time spent on the initial Code § 341 meeting of creditors, and that such work benefitted the estates. Time spent relating to its own retention allegedly was required because of the size of the conflicts check needed and for addressing opposition to their retention.

In response to the concerns of the Committee, STB responds that the services for which it is requesting compensation are paid for by non-bankruptcy clients, and that therefore STB should not be penalized in light of Congress' intent to reject the "economy of administration" approach to compensation in bankruptcy cases.

## DISCUSSION

■ The standard practice of professionals submitting fee applications should be to "make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary; just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983) (discussing billing practice in context of statutory attorney fees). This exercise of "billing judgment" is an essential, and as noted above, ethically mandated, component of every fee application submitted to the court.

It is important to note that the Court appreciates and understands a concern shared by many of the fee applicants in these cases regarding the potential for "double disallowance" of certain fees or expenses because they may fall into more than one category of the Fee Auditor's Reports. For example, since a time entry proposed for disallowance as pre-retention billing may also appear on another exhibit which categorizes that entry in a different way, there is a chance that an entry already proposed for disallowance could be criticized again for a different reason in a different category. This would produce an unjust result, and the professionals have themselves indicated that adding the totals in each Fee Auditor category would result in a sum far greater than that requested by the applicants. The Court has reviewed the applications aware of these potential problems. As a result, the Court has made every effort to ensure that no time entry that was disallowed in one category was disallowed again in another. The Fee Auditor provided information indicating the other exhibits in which a particular time entry appears again, and thus the Court was able to cross-reference any disallowed entries to prevent double disallowance.

Although many professionals subject to the fee audit process have stated that the Court need not become enmeshed in a detailed analysis of every item in a fee application, the Court has a responsibility to review the proposals of the Fee Auditor and to make an independent finding regarding the appropriateness of the requested fees and expenses. Based on concerns of parties involved in these cases, and the recognition that some type of fee examiner was necessary to initially review the fee applications submitted in these cases due to the volume and complexity of them, it would be inappropriate for the Court not to consider carefully both the fee applications themselves and the proposals of the Fee Auditor.[5]

*"Nunc tunc" appointment*

■ Code § 327(a) authorizes a trustee to employ one or more professionals, including

---

5. The Court notes that the allowance or disallowance in this Decision of certain types or categories of services and expenses requested does not prevent the Court in future fee applications from examining other or re-examining the same types of services and expenses it has allowed or disallowed herein.

attorneys and accountants, with the bankruptcy court's approval. 11 U.S.C. § 327(a). Authority for compensating such professionals is found in Code §§ 330 and 331, which permit the court to award reasonable compensation to a professional employed under Code § 327. Prior to any award of interim or final compensation, however, a professional's employment must be approved formally by the bankruptcy court. This approval generally must occur before any compensable services are rendered to the estate. *See In re Rainbow Press of Fredonia*, 197 B.R. 428, 429 (Bankr.W.D.N.Y.1996); *In re 245 Assocs., LLC*, 188 B.R. 743, 749 (Bankr. S.D.N.Y.1995); *In re Sapolin Paints, Inc.*, 38 B.R. 807, 817 (Bankr.E.D.N.Y.1984). This is true regardless of whether any pre-approval services were rendered in good faith and were beneficial to the estate. *See Sapolin*, 38 B.R. at 817.

In the Second Circuit, this *"per se"* rule prohibiting payment to professionals for services rendered to the estate prior to approval by the court has been applied strictly. *See, e.g., Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.)*, 655 F.2d 463, 469 (2d Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Smith v. Winthrop, Stimson, Putnam & Roberts (In re Sapphire Steamship Lines, Inc.)*, 509 F.2d 1242, 1245–46 (2d Cir.1975); *General Motors Acceptance Corp. v. Updike (In re H.L. Stratton, Inc.)*, 51 F.2d 984, 988 (2d Cir.1931), *cert. denied*, 284 U.S. 682, 52 S.Ct. 199, 76 L.Ed. 576 (1932); *In re Robotics Resources R2, Inc.*, 117 B.R. 61, 62 (Bankr.D.Conn.1990); *In re French*, 111 B.R. 391, 394 (Bankr.N.D.N.Y.1989); *In re Ochoa*, 74 B.R. 191, 195–96 (Bankr.N.D.N.Y.1987); *In re Cuisine Magazine, Inc.*, 61 B.R. 210, 216–17 (Bankr.S.D.N.Y.1986); *Hucknall Agency, Inc. v. Nanni (In re Hucknall Agency, Inc)*, 1 B.R. 125, 126–27 (Bankr.W.D.N.Y. 1979). Enforcement of such a strict rule enables the court to examine any potential conflicts of interest that a professional may have prior to the rendering of services, *see*

*Futuronics*, 655 F.2d at 469, thereby avoiding the emotional pressure to award fees which can arise if services have already been rendered. *See In re Rogers–Pyatt Shellac Co.*, 51 F.2d 988, 992 (2d Cir.1931). It also discourages volunteer services and maintains control of costs to the estate by avoiding payment for services which may not otherwise have been authorized. *See In re Eureka Upholstering Co.*, 48 F.2d 95, 96 (2d Cir. 1931); *245 Assocs.*, 188 B.R. at 749; *Sapolin Paints*, 38 B.R. at 817.

■ Despite the apparent rigidity and harsh consequences of the *per se* rule, certain exceptions have been recognized. In situations where a professional seeks payment for services performed prior to the order of appointment, courts have considered *nunc pro tunc* [6] appointments as a vehicle to authorize payment for such services. *See, e.g., Fanelli v. Hensley (In re Triangle Chemicals, Inc.)*, 697 F.2d 1280, 1289 (5th Cir.1983); *Cohen v. United States (In re Laurent Watch Co., Inc.)*, 539 F.2d 1231, 1232 (9th Cir.1976); *In re King Elec. Co., Inc.*, 19 B.R. 660, 663 (E.D.Va.1982). *Nunc pro tunc* orders effectively subvert the *per se* rule, however, and therefore they are generally disfavored in this Circuit. *See Futuronics*, 655 F.2d at 469; *245 Assocs.*, 188 B.R. at 750 (citing *In re Corbi*, 149 B.R. 325, 333 (Bankr.E.D.N.Y. 1993) and *In re Rundlett*, 137 B.R. 144, 146 (Bankr.S.D.N.Y.1992)); *In re Northeast Dairy Co-op Federation, Inc.*, 74 B.R. 149, 154 (Bankr.N.D.N.Y.1987).

There are, however, limited exceptions to this rule. This Court has recognized the "excusable neglect" or "unavoidable hardship" exception to the *per se* rule. *See Ochoa*, 74 B.R. at 195 ("The only recognized exception to the Second Circuit's 'per se' rule is the concept of 'excusable neglect' "); *In re Northeast Dairy Co-op Federation, Inc.*, 74 B.R. 149, 155 (Bankr.N.D.N.Y.1987) ("It appears the only recognized exception to the harsh result occasioned by application of the 'per se' rule is 'excusable neglect' or 'un-

**6.** As observed by some courts, use of the term *"nunc pro tunc"* in relation to applications by professionals seeking appointment prior to the date on record is not exactly proper. *See In re Jarvis*, 53 F.3d 416, 418 n. 2 (1st Cir.1995); *In re*

*Singson*, 41 F.3d 316, 318–19 (7th Cir.1994). For the purpose of this Decision, however, the Court will adhere to the practiced usage in this Circuit of the Latin phrase *"nunc pro tunc"* to refer to such applications.

avoidable hardship'"); *see also In re Amherst Mister Anthony's Ltd.*, 63 B.R. 292, 294 (W.D.N.Y.1986) (recognizing exception).

Excusable neglect has generally been defined as "the failure to timely perform a duty due to circumstances which were beyond the reasonable control of the person whose duty it was to perform," *see Beneficial Fin. -Co. v. Manning (In re Manning)*, 4 BCD 304, 305 (Bankr.D.Conn.1978), such as when a party fails to meet an obligation due to unique or extraordinary circumstances. *See Northeast Dairy*, 74 B.R. at 155; In *re Waterman Steamship Corp.*, 59 B.R. 724, 727 (Bankr. S.D.N.Y.1986); *see also Robotics Resources R2*, 117 B.R. at 62; *In re Brown*, 40 B.R. 728, 731–32 (Bankr.D.Conn.1984).

As noted by the court in *In re 245 Associates, LLC*, 188 B.R. 743 (Bankr.S.D.N.Y. 1995), however, the United States Supreme Court had occasion to interpret the term "excusable neglect" in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), as that term is used in Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.") regarding late claims. *245 Assocs.*, 188 B.R. at 751. *In Pioneer*, the Supreme Court expanded the definition of "excusable neglect" to include "inadvertence, mistake, or carelessness." *Pioneer*, 507 U.S. at 388, 113 S.Ct. at 1495. While acknowledging that the extension of the *Pioneer* definition of excusable neglect regarding late claims to *nunc pro tunc* employment applications does not necessarily follow, Bankruptcy Judge Stuart M. Bernstein nonetheless held that the *Pioneer* standard should be applied to employment applications.[7] *245 Assocs.*, 188 B.R. at 751; *see also In re Singson*, 41 F.3d 316, 319–20 (7th Cir.1994) (applying *Pioneer* standard to *nunc pro tunc* employment applications). The court found that authorization of a *nunc pro tunc* application would be allowable in cases where the applicant does not have a

conflict of interest and demonstrates excusable neglect under the more liberal *Pioneer* test. *245 Assocs.*, 188 B.R. at 752.

In fact, a seemingly more liberal approach to *nunc pro tunc* employment applications than that found in *245 Associates* case is found in *In re Piecuil*, 145 B.R. 777 (Bankr. W.D.N.Y.1992), which was decided prior to *Pioneer*. In *Piecuil*, Chief Bankruptcy Judge Michael J. Kaplan reviewed Second Circuit case law regarding application of the *per se* rule and concluded that in almost every early Circuit case out of which the rule grew, there were alternate grounds to deny appointment of the professional even if timely application had been made. Judge Kaplan instead formulated the following test: "It is to say that the applicable case law permits the Court, as a court of equity, latitude to grant relief where the failure to file a timely application has been explained, and the explanation has been found reasonable." *Piecuil*, 145 B.R. at 783 (footnote omitted); *see also In re Rainbow Press of Fredonia*, 197 B.R. 428, 429 (Bankr.W.D.N.Y.1996) (Bucki, J.) (expressly agreeing with test formulated in *Piecuil* ); *In re Corbi*, 149 B.R. 325, 333 (Bankr.E.D.N.Y.1993) (same).

While this Court does not advocate punctilious application of the *per se* rule, boundaries regarding its use must necessarily be drawn. To the extent, if any, that *Piecuil* and its progeny expand the rule regarding *nunc pro tunc* employment applications beyond the *245 Associates* court's incorporation of the *Pioneer* standard, this Court respectfully declines to follow such test.[8] As noted in this Court's Decision in *In re Household Merit, Inc.*, No. 94–62969 (Bankr.N.D.N.Y. Apr. 14, 1995), the excusable neglect exception should not be expanded to the point where the exception swallows the rule itself. *Id.* at 6.

Turning to the case *sub judice*, the fee application of STB seeks, *inter alia*, appointment *nunc pro tunc* to April 18, 1996,

---

7. *But see In re Franklin Savs. Corp.*, 181 B.R. 88, 89 (Bankr.D.Kan.1995) (finding that *Pioneer* does not apply to *nunc pro tunc* employment applications); *In re Berman*, 167 B.R. 323, 324 (Bankr. D.Mass.1994) (same).

8. The Court notes that it does not expressly pass on the propriety of extending *Pioneer's* expanded definition of "excusable neglect" to *nunc pro tunc* employment applications, as the applicant herein satisfies the more restrictive definition of excusable neglect that the Court has utilized in prior Decisions.

rather than April 22, 1996, the date on which the Trustee submitted STB's employment application for approval by the Court. As STB correctly points out, two days of this intervening four-day period were on a weekend, and STB further notes that the Trustee himself was appointed only late in the day on Thursday, April 18, 1996. Review of STB's First Interim Fee Application reveals that STB immediately began work on the application for employment on April 18, continued working on it through the weekend, and submitted it on the Monday following the Trustee's appointment. Due to the large size and complex and interlocking nature of the Bennett cases, it is entirely understandable that STB, a large law firm itself, was unable to complete a proper conflicts check of its own client base prior to the weekend of April 20 and 21. In the meantime, the potential existed for a precipitous loss of assets and information from the Bennett companies. Furthermore, STB entered this case only after the bankruptcy petitions had been filed. Immediate action was necessary to limit potential losses, and STB should not be penalized for its actions. Under the standard that this Court has used in its prior decisions relating to *nunc pro tunc* employment applications, STB has satisfied the test of excusable neglect, in that the failure to submit the application was beyond the reasonable control of STB in light of the unique and extraordinary circumstances of this case and its employment. *See, e.g., Northeast Dairy,* 74 B.R. at 155. Despite the fact that the information regarding potential conflicts of interest was indeed within the control of STB, the ability to perform and file an adequate and proper conflicts check in a shorter period of time was likely beyond the reasonable control of STB. It is this Court's opinion, however, that STB's employment should not be authorized prior to April 19, 1996, as little argument can be made that they should receive payment for actions taken even prior to the Trustee's appointment and approval. Therefore, fees prior to April 19, 1996 shall be disallowed in the amount of $26,412.50.

*Duplicate Billing Entries*

The Fee Auditor identified three entries which were potentially duplicates of other billing entries. STB acknowledged that the entries were inadvertently made, and has agreed to a reduction of its fee request in the amount of $2,865.

*Vague Documentation of Services*

 It is well settled that the bankruptcy court has an affirmative obligation to examine fees and expenses requested even if no objection has been made. *See In re Ferkauf Inc.,* 42 B.R. 852, 853 (Bankr.S.D.N.Y.1984), *aff'd,* 56 B.R. 774 (S.D.N.Y.1985); *In re Copeland,* 154 B.R. 693, 697 (Bankr. W.D.Mich.1993); *In re J.F. Wagner's Sons Co.,* 135 B.R. 264, 266 (Bankr.W.D.Ky.1991). It is also true that the court may award compensation only for actual and necessary services and expenses under Code § 330(a), and that the burden of proving that services rendered were actual and necessary, and that the compensation sought is reasonable, rests with the applicant. *See Brake v. Tavormina (In re Beverly Mfg. Corp.),* 841 F.2d 365, 370 (11th Cir.1988); *In re Ward,* 190 B.R. 242, 245 (Bankr.D.Md.1995); *In re Navis Realty,* 126 B.R. 137, 145 (Bankr.E.D.N.Y.1991). To meet this burden, the applicant must support its request for fees and expenses with specific, detailed and itemized documentation. *See In re Poseidon Pools of America, Inc.,* 180 B.R. 718, 729 (Bankr.E.D.N.Y.1995); *In re Gold Seal Prods. Co., Inc.,* 128 B.R. 822, 827 (Bankr.N.D.Ala.1991); *see also J.F. Wagner's Sons Co.,* 135 B.R. at 267 (stating that professionals have burden of providing adequate description of services and expenses to allow court to make finding of reasonableness). Interim fee applications submitted pursuant to Code § 331, like the STB application at issue herein, are judged under the same standards as final applications under Code § 330. *See In re CF & I Fabricators of Utah, Inc.,* 131 B.R. 474, 482 (Bankr. D.Utah 1991); *In re RBS Indus., Inc.,* 104 B.R. 579, 581 (Bankr.D.Conn.1989).

 In cases where the time entry is too vague or insufficient to allow for a fair evaluation of the work done and the reasonableness and necessity for such work, the court should disallow compensation for such services. *See Poseidon,* 180 B.R. at 730; *J.F. Wagner's,* 135 B.R. at 267; *Gold Seal*

*Prods.,* 128 B.R. at 828. The court should be able to determine from the fee entries themselves the legal issues involved, the difficulty of the issues and the resolution or results obtained for the estate. *See Navis Realty,* 126 B.R. at 142; *In re Lafayette Radio Electronics Corp.,* 16 B.R. 360, 361 (Bankr. E.D.N.Y.1982). Without such detailed entries it is difficult, if not impossible, to "make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed." *Hensley v. Eckerhart,* 461 U.S. 424, 441, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983) (Burger, C.J., concurring).

■■■■ For example, time entries for telephone calls must indicate the parties involved and the purpose and length of the conversation. *See In re NRG Resources, Inc.,* 64 B.R. 643, 653 (W.D.La.1986); *Poseidon,* 180 B.R. at 730. Entries such as "telephone call with Mr. X" are insufficient descriptions of services, *see Navis Realty,* 126 B.R. at 143; *In re R & B Institutional Sales, Inc.,* 65 B.R. 876, 881 (Bankr.W.D.Pa.1986), as such entries fail to "indicate the function, substance, necessity or benefit of the call with sufficient particularity to permit the court to evaluate whether or not the service is compensable." *In re Office Prods. of America,* 136 B.R. 964, 977 (Bankr.W.D.Tex. 1992). As the burden of proof to show that services rendered were necessary, appropriate and reasonable is on the applicant, *see id.* at 976; *In re Pettibone Corp.,* 74 B.R. 293, 299 (Bankr.N.D.Ill.1987), it is not the court's responsibility to recognize or assume that a vague time entry meets these requirements. Those entries that are made vague intentionally to protect privileged or confidential material should be noted appropriately, such as by the word "Redacted," and such information should be available to the court for *in camera* review if the need should arise.

■■■■ Likewise, time entries for either intra-office or other conferences must denote sufficient information for the court to determine whether the service provided and the fees charged were necessary and reasonable. *Office Prods. of America,* 136 B.R. at 976. At a minimum, such entries should indicate the participants and the nature and purpose of the conference. *See Navis Realty,* 126 B.R. at 143; *Pettibone,* 74 B.R. at 301. While this Court recognizes the need for intra-office conferences, such time spent must be justified. *See Office Prods. of America,* 136 B.R. at 977. It is also an accepted principle that generally no more than one attorney may bill for time spent in intra-office conferences or meetings absent an adequate explanation. *See Poseidon,* 180 B.R. at 731; *In re Adventist Living Ctrs., Inc.,* 137 B.R. 701, 716 (Bankr.N.D.Ill.1991); *Office Prods. of America,* 136 B.R. at 977; *In re Environmental Waste Control,* 122 B.R. 341, 347 (Bankr.N.D.Ind.1990); *In re Wiedau's, Inc.,* 78 B.R. 904, 908 (Bankr.S.D.Ill. 1987).

■■■■ Review of STB's fee application and the Report regarding intra-office conferences reveals that STB routinely bills for those attorneys attending them regardless of the substance of the conference. According to exhibit N of the Report, the total amount billed to the estates for these intra-conferences amounts to $373,583.25. While STB has replied that such conferences are necessary both for coordinated administration of the estate and to consult with attorneys who are experts in particular areas of law relevant to the issues in these cases, analysis of the entries reveals that a great majority of the conferences involve the attorneys who are primarily responsible for handling these cases. The Court acknowledges that when other attorneys are called upon to render specific advice regarding their specialty to an attorney working on these cases, then both (or all, if appropriate) should be allowed to bill for their time. Routine billing by two or more attorneys for every consultation regarding issues or projects in these cases generally will not be compensable. In fact, a large majority of the intra-office conferences have time entries of four-tenths of an hour or less, which may be indicative that these conferences are discussions of issues familiar to the attorneys working on these cases, rather than conferences with specialists in different areas of law. On balance, however, the Court is aware of the need for detailed discussions between attorneys involved in these complex cases at various points. Therefore,

the Court shall disallow 25% of the total time entries categorized as intra-office conferences. Thus, of the total of $373,583.25 listed in exhibit N of the Fee Auditors Report, the Court shall disallow $93,395.81. Future fee applications should support the need or appropriateness of billing for multiple professionals attending intra-office conferences in order to be considered for full compensation. Likewise, professionals should exercise billing judgment in future fee applications to remove some of the duplicative time entries for general conferences.

▮ Regarding the detail necessary to prevent disallowance for vague time entries, the Court does not seek to impose an excessively burdensome reporting requirement on the professionals in these cases, and therefore has not disallowed all time entries which could be classified as vague pursuant to the standards noted earlier. The Court does not approach the fee applications as though unfamiliar with the details and needs of these cases, and where possible the professionals were given the benefit of doubt, although this magnanimity shall be curtailed during review of future fee applications in these cases. Nonetheless, sufficient description of services is expected. Upon review of the vague time entries as classified in exhibits E, F and G of the Fee Auditor's Report, which total $87,959, in tandem with the additional supporting information submitted by STB in response to the Report, the Court disallows only $3,571.50 in vaguely described conferences and $832.50 in other vaguely described tasks. The balance of the vague entries identified were sufficiently described or were supported by additional sufficient information submitted by STB.

### Multiple Attendance at Events

▮ While the Fee Auditor identified a significant amount of entries reflecting multiple attendance at events, the Court is aware that the magnitude and diversity of work involved in sorting through the financial quagmire encountered in these cases would be difficult, if not impossible, for just one or two attorneys to address properly. Clearly, a single attorney cannot be fully versed with the myriad of adversary proceedings, motions and issues in these cases, thereby requiring multiple attendance at events. As with every other area, however, professionals are expected and required to exercise billing judgment, and where possible they should make every effort to reduce the attendance or staffing on matters.

### Filing Papers and Clerical or Administrative Tasks

Time entries for filing or retrieving documents reflect an expensive method of delivering or obtaining documents. As noted by Bankruptcy Judge Leif M. Clark in *In re Office Products of America, Inc.*, 136 B.R. 964 (Bankr.W.D.Tex.1992), some courts have found that non-legal work performed by an attorney which could have been accomplished by non-legal employees more economically should not be compensated at the attorney's regular rate. *Id.* at 977 (citing *In re Wiedau's*, 78 B.R. at 908–09; *In re Pettibone*, 74 B.R. at 303). More recently, Bankruptcy Judge Marvin Holland in *In re Poseidon Pools of America, Inc.*, 180 B.R. 718 (Bankr. E.D.N.Y.1995), noted that while there are occasions where personal delivery or retrieval of documents by an attorney or paralegal is required, the burden is on the applicant to show why this method was used instead of utilizing a messenger, overnight delivery, facsimile or the U.S. Mail. *Poseidon*, 180 B.R. at 735–36.

This Court has previously held that secretarial time is generally an overhead expense that is factored into an attorney's hourly rate, and as such is not separately compensable. *See In re Command Servs. Corp.*, 85 B.R. 230, 233 (Bankr.N.D.N.Y.1988). Since that decision, the Third Circuit Court of Appeals rendered its decision in *In re Busy Beaver Building*, 19 F.3d 833 (3d Cir.1994), which indicated that clerical services may indeed be compensable when performed by an attorney or paralegal, although perhaps at a lower rate. *Id.* at 849. The court stated that the proper focus of inquiry is whether non-bankruptcy attorneys typically charge for such services when performed by an attorney or paralegal, "and the rates charged

and collected therefor." *Id.*[9] The court derived this test by relying on its analysis of the plain meaning of Code § 330. *See id.* at 848. In the comprehensive and well-reasoned fee application decision in *Poseidon Pools,* however, Judge Holland observed that as a result of deferring to the "market" in which a professional practices, the Third Circuit appears to have interpreted Code § 330(a) to *require* compensation for such services if non-bankruptcy attorneys typically charge their clients for them. *Poseidon,* 180 B.R. at 745. He noted that mandating some level of compensation for services which are clerical in nature is clearly contrary to the plain meaning of Code §˙330(a). *Id.* at 746 n. 2. Instead, Judge Holland found that the better analysis of Code § 330(a) is that it grants the court discretion to award reasonable compensation even if such services are actual and necessary.[10] *Id.*

Even *Busy Beaver* recognized that some services performed at some firms by paralegals may not be compensated. *See Busy Beaver,* 19 F.3d at 855. Perhaps the reason that the Third Circuit held that the proper focus of compensation is not on *what* service is performed but rather on *by whom* it is performed, thus affecting the *rate* of compensability and not compensability *vel non,* is that if an attorney is spending time performing tasks which are arguably clerical, which to this Court seems more properly classified as overhead and thus incorporated into the billing rate of the professional, these services would in effect go completely uncompensated. This is so because if clerical services are included in the professional's billing rate, such services should not be separately billed; however an attorney or paraprofessional performing such tasks would not be able to bill anything, and thus no fee would be generated out of which clerical services could be covered. For example, if an attorney spent an hour faxing documents or mailing letters, the task itself should be classified as clerical and not billed because it is subsumed within the

hourly rate charged by the attorney. If the attorney cannot bill something for that hour of time, however, there is no fee out of which overhead can be allocated.

Returning to the argument that professionals should be compensated at market rates for market services, the Court observes that the Third Circuit may not have considered the possibility that many of the clients which comprise the "market" for large firms in major cities may have neither the time nor the incentive to scrutinize legal services and their corresponding fee charges, and thus certain markets may not always reflect the concerns of cost-conscious clients who nonetheless seek able and well-respected counsel. Indeed, one reason why some consumers of legal services may not have the incentive to closely examine the items and rates for which they are charged is that, unlike a bankrupt estate, they may be able to pass the cost of legal services on to their clients or customers. In bankruptcy cases, every dollar spent on legal services is a dollar less for the creditors. *See In re Spanjer Bros., Inc.,* 203 B.R. 85, 90 (Bankr.N.D.Ill.1996); *In re Allied Computer Repair, Inc.,* 202 B.R. 877, 885–86 (Bankr.W.D.Ky.1996); *In re Hotel Assocs.,* 15 B.R. 487, 488 (Bankr.E.D.Pa.1981).

 It is the opinion of this Court that bankruptcy courts must not become slaves to the prevailing "markets," and thus be prevented from making any judgments as to the necessity of services performed and the reasonableness of the fees charged. If the courts were placed in such a position, Code § 330(a)(1)(A) effectively would be written out of the Bankruptcy Code, and professionals would need only to submit their fee application with an explanation that their market compensates them for such services at the requested amounts. Congress has not chosen to relieve the bankruptcy courts of their duty to review fee requests, and thus such an interpretation of the market theory must necessarily fail.

---

**9.** This test essentially focuses on the "market" created by consumers of legal services where the professional practices.

**10.** "Thus, under the literal interpretation of 11 U.S.C. § 330(a), even where a court finds that a particular service is actual and necessary it has

discretion in determining to award compensation for such service. To hold otherwise would be to read and interpret the word 'may' in 11 U.S.C. § 330(a) as 'shall' or 'must.'" *Poseidon,* 180 B.R. at 746 n. 23.

■ Regardless of the differing interpretations of Code § 330(a), however, the fee applicant must still meet,

> its burden which exists independent of Busy Beaver Building of showing ... that the majority of firms in this district regularly (a) charge clients for clerical services at the rates charged by the [fee applicant], and (b) disclose to their clients that they are being charged for clerical services at professional or paraprofessional rates. Moreover, this Court is not able to take judicial notice that the practice of charging professional or paraprofessional rates for clerical services is common and acceptable in the legal "market" because we have no reason to think that such practice exists.

*Poseidon Pools*, 180 B.R. at 746. Even if clerical services are held to be compensable, if such services are rendered by an attorney or paralegal,

> an applicant has the burden of providing the court with information such that a court can determine whether it was necessary for the clerical service to have been performed by an attorney or paralegal as opposed to being performed by a paralegal or secretary, respectively. Where this burden is not met a court cannot conclude that the clerical service was "necessary" and therefore compensation for such service is not warranted.

*Id.*

■ Thus, it is necessary for the applicant to carry its burden of proof regarding the reasonableness and necessity of clerical services performed by attorneys and paraprofessionals as the applicant must in every other area of its fee application.

■ The estate must be considered a reasonably prudent and cost-conscious consumer of legal services, as this is what we would expect of any consumer of services or goods. With this in mind, and with the independent responsibility imposed upon it by the Bankruptcy Code, the Court reviews fee applications to determine whether the applicant seeks "reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person em-

ployed by any such person...." 11 U.S.C. § 330(a).

■ The Court reviewed STB's fee application with these very important guidelines in mind. Also persuasive was STB's argument that many of the facially clerical services for which attorneys or paraprofessionals billed actually required special legal skills. For example, STB asserted that the organization of files and preparation of court documents required the exercise of professional judgment by paralegals. The Court is keenly aware of the necessity for paralegals with specialized skills in today's legal arena and does not seek to substitute its own judgment to broadly reclassify certain types of activities performed by them as clerical or administrative services. Nonetheless, certain activities identified by the Fee Auditor are by their nature more appropriately categorized as clerical or administrative, for which professional or paraprofessional billing rates are inappropriate.

Upon review of STB's fee application and exhibit I of the Fee Auditor's Report entitled "Administrative or Clerical Tasks," the Court has noted entries such as "prepared papers for filing," "copying documents for distribution," "file same with court," and "checked faxes and delivered them to appropriate persons," all with significant fees attached to them. After careful consideration of each page of the services classified as administrative or clerical tasks by the Fee Auditor, and mindful of the Third Circuit's analysis regarding compensation for such tasks by professionals or paraprofessionals, the Court shall reduce by 15% the total amount of $265,433.50 so categorized. Thus the amount of $39,815.03 shall be disallowed.

■ In addition, a specific issue has arisen regarding the compensation of word processing time, which STB billed as a lump expense. Whether or not this time is specifically allocable to a particular client or matter, it is a clerical service regardless of who performs it. *See Jenkins*, 491 U.S. at 288 n. 10, 109 S.Ct. at 2471 n. 10 ("[P]urely clerical or secretarial services should not be billed at a paralegal rate, regardless of who performs them"); *Sapolin Paints*, 38 B.R. at 816 ("In

the view of the Court, word processing is an alternative to secretarial services which constitute part of the normal overhead of a law office and is computed for by the hourly rate charged"); *see also* Amended Order, at ¶ 10(c) (indicating that word processing time shall be considered an item of overhead expense not separately compensable). Throughout each day in professional firms, almost every person's time is allocable to some client or matter, but that fact does not make the service necessarily separately compensable. In addition, professionals in these cases would have difficulty in demonstrating that such services require performance by attorneys or paraprofessionals. Based on the above, the request of STB for compensation in the amount of $45,603 in word processing expenses shall be disallowed.

## Preparation of Fee Applications

■ Under Code § 330(a), "[a]ny compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application." 11 U.S.C. § 330(a)(6). It is generally accepted that reasonable compensation is appropriate for time spent preparing a fee application. *See, e.g., Braswell Motor Freight Lines, Inc. v. Crutcher, Burke & Newsom (In re Braswell Motor Freight Lines, Inc.)*, 630 F.2d 348, 351 (5th Cir.1980); *Office Prods. of America*, 136 B.R. at 967; *CF & I Fabricators*, 131 B.R. at 483; *Pettibone*, 74 B.R. at 304. Compensation for such work yields incentive "to engage in a comprehensive review of the time expended and the value thereof," perhaps resulting in a discount of the amount billed. *See Pettibone*, 74 B.R. at 304. In fact, since preparation of detailed fee applications for the bankruptcy court's review is a prerequisite to payment, which no doubt can consume valuable and substantial time depending on the magnitude of the fee application, it seems that it would be unduly burdensome and unfair to require that professionals go completely uncompensated for such a task. *See In re Nucorp Energy, Inc.*, 764 F.2d 655, 659 (9th Cir. 1985); *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1093 (5th Cir.1980). It is proper, however, for the bankruptcy court to examine the amount and value of time spent pre-paring the application, *see Office Prods. of America*, 136 B.R. at 977, and reasonable limits may be placed on compensation for such work. *Pettibone*, 74 B.R. at 304.

■ According to the Fee Auditor, the recomputed total of fees and expenses requested by STB is $2,419,607.86. Billing entries which relate to the actual preparation of the fee application total $9,072.50. This amount is deemed reasonable and shall not be disallowed.

## Election of the Trustee

■ The Court notes that despite the argument of STB that time spent relating to the election of the Trustee was inextricably intertwined with time spent preparing for the Code § 341 meeting of creditors, a significant number of entries relate to services rendered for the election, which does not directly result in a benefit to the estate. The Court deems that a portion of the time spent on this service is excessive and not reasonable and therefore will reduce the total amount of $66,660 listed in exhibit GG of the Fee Auditor's Report by 25%, and thus the sum of $16,665 shall be disallowed. This figure takes into consideration the fact that some of the entries in this exhibit have been disallowed for other reasons.

## STB's Retention

■ The Court also observes that fees in the amount of $49,424 relating to the retention of STB in exhibit HH–2 of the Fee Auditor's Report are substantial, and that this figure should be reduced by 30%, as an award greater than this amount is not reasonable given the purpose of the activity billed for, which is to enable STB to be employed in order to perform services on behalf of the Trustee for the estates. Based on the above, the sum of $14,827.20 shall be disallowed as an amount above that which results in a benefit to the estates.

## Conflicts Check

■ The Court deems that payment may be made for a reasonable amount of time and expense incurred by an approved professional for performing a conflicts check. STB has

expended 44.3 hours on this matter in the total amount of $10,249.50, based on exhibit HH–3 of the Fee Auditor's Report. This amount is deemed reasonable and no deduction shall be made.

*Hourly Rates Charged by Professionals*

■ A generally accepted starting point for determining the compensation due to a professional who bills on an hourly basis is to multiply the hours worked by the rate that the professional charges. *See In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 17 (Bankr.S.D.N.Y.1991). This method of determining a professional's compensation is commonly referred to as the "lodestar method." Regardless of the outcome of the lodestar calculation, however, the court must still examine the professional's time records in order to determine whether all of the time billed should be compensated at the stated hourly rate. *Id.*

■ The Court examines the fee applications of the professionals in these cases well aware of the fact that the notion of economy of administration when dealing with a bankrupt estate was the prevailing spirit under the Bankruptcy Act, but that this notion was abandoned during the enactment of the Bankruptcy Code in 1978. *See In re Ames Dept. Stores, Inc.,* 76 F.3d 66, 71 (2d Cir.1996); *Drexel,* 133 B.R. at 18–20; *In re Cena's Fine Furniture, Inc.,* 109 B.R. 575, 583 (E.D.N.Y.1990); *In re Nine Assocs., Inc.,* 76 B.R. 943, 945 (S.D.N.Y.1987). Instead, Congress explicitly decided that compensation for services rendered by professionals under title 11 would be "at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11." *Drexel,* 133 B.R. at 19 (quoting statement of Sen. DeConcini, 124 Cong. Rec. § 17,406 at 6511). This approach relies on the "market" of comparable legal services to assist in determining the level of compensation to be awarded, the purpose of which was to attract competent professionals to bankruptcy practice. *See Drexel,* 133 B.R. at 19–20; *see also In re RBS Indus., Inc.,* 104 B.R. 579, 582 (Bankr.D.Conn.1989). As recently stated by the Second Circuit, based upon those services that a reasonable lawyer or law firm would render in similar circumstances, if services are reasonably likely to benefit the estate, they should be compensable. *See Ames Dept. Stores,* 76 F.3d at 72.

Based on some objections to fee applications filed in these cases, there is a concern that the hourly rates charged by some of the professionals in these cases are excessive. Understanding the complexity and magnitude of these cases, however, it was deemed acceptable to hire professionals from outside of this geographic area to assist with these cases. This is not to suggest that professionals of the required caliber are not available in this area, but rather is more indicative of the necessity for extensive resources to resolve these complex issues in an expedited fashion. Such professionals bill their time at a higher rate according to the market in which they practice, and it would be unduly burdensome and unfair to expect that they accept the appointment to represent the estates at rates billed by the "local" market, while still incurring the costs and overhead of their particular geographic market. This does not mean that the Court is powerless to control fees billed by out-of town professionals. Some of the professionals in these cases with comparatively high billing rates have agreed to cap their blended hourly rate at $250 per hour. In addition, in response to concern over its billing rates, STB agreed not to bill for time spent traveling from New York City to or from Utica or Syracuse. These concessions represent constructive efforts to reduce the cost of legal services to the estates in these cases. Furthermore, this Court has previously recognized the propriety of higher professional billing rates where out-of-town professionals are necessarily employed. *See, e.g., In re Victory Markets, Inc.,* No. 95–63366, slip op. at 6 (Bankr.N.D.N.Y. Nov. 7, 1996); *In re ICS Cybernetics, Inc.,* 97 B.R. 736, 740 (Bankr.N.D.N.Y.1989). The hourly fees charged by STB are not unusual for a law firm of its size located in a major metropolitan city, and other than the compromises described above that STB has already made, no reduction in hourly fees shall be made.

The Court does not concede, however, that every service and expense for which an out-

of-town professional firm bills and receives compensation for in its market is compensable as of right. As discussed earlier, such a holding would effectively enervate Code § 330(a) and the Court's responsibility to review fee applications to determine the reasonableness of actual and necessary services, since the only showing a professional would have to make is that it bills its non-bankruptcy and/or its own geographic market clients for the rates and services submitted, thus mandating that they be compensated accordingly for such work based on Congress' adoption of the market theory of compensation for attorneys in bankruptcy matters. This clearly could not have been the intent of Congress.

*Travel Time*

■ As stated by the Court in the Amended Order regarding the fee application process, travel time will be compensable at one-half normal rates unless the Court is satisfied that work was performed during travel. The Court also noted, however, that the right to apply for compensation of travel time would be subject to any limitations or agreements made with professionals in connection with their employment. An agreement was made by STB not to bill for travel time incurred while traveling between New York City and either Syracuse or Utica, *see* Order dated May 28, 1996, at 6, and as pointed out by STB, they have not billed for approximately $135,000 worth of travel time between New York City and Syracuse. In the future, STB's fee applications should indicate that they are not billing for travel time between Syracuse and Utica, since STB routinely flies into Syracuse rather than Utica in order to appear in Court in Utica.

*Unreceipted Expenses*

■ Unlike other professionals in these cases, STB failed to submit actual vendor receipts for its expenses, as required by the Amended Order dated December 2, 1996. Other professionals have complied with this requirement, and thus the Court does not deem it appropriate that STB expect payment on its expense requests without this required documentation. Under the Amended Order, only travel and meal receipts totaling more than $25 need to be submitted. This is not an undue or unjust burden, and therefore STB must submit copies of such receipts in order to seek payment for such expenses. STB's argument that the Local Rules do not require the submission of actual receipts is not persuasive, as it overlooks paragraph 9(g) of the Amended Order, wherein the Court stated that the terms of the Amended Order control in instances where there is a conflict with the Local Rules.

*Other Expenses*

■ Even without documentation, the Court can rule regarding the compensation of certain expenses requested by STB. Of the total requested, $620.06 is for expenses incurred pre-retention and therefore shall be disallowed. STB has acknowledged that items totaling $45.15 were mistakenly included twice, and has voluntarily reduced their expense request by such amount. Overtime transportation in the amount of $7,098.27 shall be disallowed, as such expenses were specifically deemed non-compensable under the Amended Order. The sum of $3,703.45 in overtime meals, $336.75 in lunch meals and $107.03 in amenities shall likewise be disallowed on the same basis.

■ Regarding the use of overnight delivery services, the Court has stated that such costs will be compensable at actual cost where shown to be necessary, and that such costs would not be routinely reimbursable. *See* Amended Order, at ¶ 10(g). STB billed $8,492.36 for Federal Express charges without submitting any explanation of the necessity for such services. This amount is considered excessive, as it appears that overnight delivery service was used routinely. Without supporting information, the Court cannot determine the necessity of such service or the savings to the estates, if any, represented by the use of overnight delivery, and therefore the Court shall disallow $3,000 in Federal Express charges. *See Environmental Waste Control*, 122 B.R. at 349 (disallowing excessive use of overnight mail service). Future applications should identify the necessity of such services and

the savings to the estates in the form of lower messenger or other delivery fees.

The Court finds a basis for "holdback" of compensation in this application, as STB has failed to submit receipts for some expenses as required by the Amended Order at ¶ 10(b). Therefore, the amount of $187,011.98 shall be "held back" pending submission of those receipts required under the Amended Order.

### CONCLUSION

■ The preparation and submission of fee applications and the review by the Court thereof are understandably burdensome, but necessary tasks, and one can readily understand the difficulty of such tasks merely by observing the sheer volume and size of the fee applications, Fee Auditor Reports, replies, responses and objections submitted in these cases. Such applications are a necessary part of representation of bankrupt estates, however, and as amply stated by Bankruptcy Judge Jack B. Schmetterer,

[t]he fee application and hearing thereon are the Applicant's opportunities to meet its burden of proof. Careful preparation of its application with supporting affidavits can meet that burden. Applicant has no basis to complain about any "adversarial" questioning by the Court seeking to carry out its responsibilities upon reading the application. Any judgment disallowing certain fees is a finding that applicant has failed to meet its burden of proof as to those fees.

*In re Pettibone Corp.*, 74 B.R. 293, 300 (Bankr.N.D.Ill.1987). Any concern as to an applicant's right to a hearing has been satisfied by the opportunity to respond formally to the findings of the Fee Auditor with whatever additional proof or explanation the professional wished to add to its fee application as specifically granted in the Order dated October 15, 1996 and the Amended Order, dated December 2, 1996. In addition, oral argument regarding the fee applications was heard by the Court on October 10, 1996, and January 9, 1997, at regular motion terms in these proceedings. Furthermore, professionals have supplemented their applications with rebuttals and replies to objections by other parties to these cases, and therefore it cannot be said that professionals have not been given their "day in court" in regard to their fee applications. *See Busy Beaver*, 19 F.3d at 845–46 (indicating necessity for an applicant's right to a hearing prior to disallowance). Any further allowance of time to supplement or argue the fee applications, other than that specifically allowed by the Court, would "overwhelm already swollen calendars." *See id.* at 846. As noted by the Court at the hearings on January 9, 1996, the fee application process should not take on a greater and separate life of its own in these already heavy and complex proceedings.

In summary:

| | | |
|---|---|---|
| Total of requested fees and expenses | | $2,413,465.00 |
| Disallowances: | | |
| Pre-retention fees | — | 26,412.50 |
| Duplicate billing entries | — | 2,865.00 |
| Intra-office conferences | — | 93,395.81 |
| Vaguely described conferences | — | 3,571.50 |
| Other vaguely described tasks | — | 832.50 |
| Administrative or clerical tasks | — | 39,815.03 |
| Word processing time | — | 45,603.00 |
| Election of the Trustee | — | 16,665.00 |
| Retention of STB | — | 14,827.20 |
| Pre-retention expenses | — | 620.06 |
| Duplicate expenses | — | 45.15 |
| Overtime transportation | — | 7,098.27 |
| Overtime meals | — | 3,703.45 |
| Lunch meals | — | 336.75 |
| Amenities | — | 107.03 |
| Overnight delivery service | — | 3,000.00 |
| Total allowed fees and expenses | | $2,154,566.75 |
| Prior temporary fee award on 10/10/96 | — | 1,000,000.00 |
| Prior temporary disbursement award on 10/10/96 | — | 100,000.00 |
| Holdback for unreceipted expenses | — | 187,011.98 |
| Remaining balance of allowed fees and expenses | | $ 867,554.77 |

Based on the foregoing, it is

ORDERED that the fees and expenses requested by STB in its First Interim Fee Application shall be disallowed as detailed above; and it is

ORDERED that prior to consideration of additional reimbursement of disbursements, STB is required to submit copies of receipts for those expenses which require receipts under the Amended Order; and it is further

ORDERED that payment of the remaining balance of fees and expenses totaling $867,-

554.77, and any amounts still due and owing on the prior temporary award, shall not be made from encumbered assets of these estates.